PEOPLE v BRANNAN

Docket No. 57603. Argued October 6, 1976 (Calendar No. 10).—Decided on rehearing and amended opinions issued March 5, 1979, and remanded to the Court of Appeals for consideration of other issues.

Herbert S. Brannan was convicted by a jury in Midland Circuit Court, James R. Rood, J., of second-degree murder. At trial, inculpatory statements made by the defendant to police officers were admitted over the defendant's objection that he had not been advised of his rights before being questioned on several occasions before he gave the statements, and that the inculpa-

Rᴇғᴇʀᴇɴᴄᴇs ғᴏʀ Pᴏɪɴᴛs ɪɴ Hᴇᴀᴅɴᴏᴛᴇs

[1, 2, 6, 7] 29 Am Jur 2d, Evidence § 555, 557.

Necessity of informing suspect of rights under privilege against self-incrimination, prior to police interrogations. 10 ALR3d 1054.

What constitutes "custodial interrogation" within rule of Miranda v Arizona requiring that suspect be informed of his federal constitutional rights before custodial interrogation. 31 ALR3d 565.

[3] 29 Am Jur 2d, Evidence §§ 529, 543-545.

[3] Necessity of informing suspect of rights under privilege against self-incrimination, prior to police interrogation. 10 ALR3d 1054.

[4] 29 Am Jur 2d, Evidence § 526, 543.

Admissibility of confession, admission, or incriminatory statement of accused as affected by fact that it was made after indictment and in the absence of counsel. 90 ALR2d 732.

[5] 29 Am Jur 2d, Evidence § 556, 573.

[8] 29 Am Jur 2d, Evidence §§ 529, 542, 543.

Suppression before indictment of confession unlawfully obtained. 1 ALR2d 1012.

[9] 29 Am Jur 2d, Evidence §§ 543-545, 549, 551.

Suppression before indictment of confession unlawfully obtained. 1 ALR2d 1012.

Admissibility of confession, admission, or incriminatory statement of accused as affected by fact that it was made after indictment and in the absence of counsel. 90 ALR2d 732.

[9] Admissibility of confession as affected by its inducement through artifice, deception, trickery, or fraud. 99 ALR2d 772.

Physiological or psychological truth and deception tests. 23 ALR2d 1306.

tory statements resulted from that questioning. The Court of Appeals, Bronson and M. J. Kelly, JJ. (D. E. Holbrook, P.J., dissenting), reversed and remanded for a new trial, holding that his statements, except for that made the first time, should have been suppressed (Docket No. 17920). The people appeal. *Held:*

1. The deciding factor for determining in each case when *Miranda* warnings must be given is an examination of the specificity of the investigation, *i.e.,* whether the investigation has focused on one suspect. The police officer claimed, and the trial court found, that the investigation in this case did not focus upon the defendant until February 16, 1973, when his fingerprints were compared with those at the scene of the murder. After that, no questions were asked prior to *Miranda* warnings. The investigation appears to have been general and routine. Polygraph tests were given to a number of people and whereabouts of acquaintances were being checked. There is no reason to disbelieve the police officer in charge or to second-guess the trial court. The defendant's alibi, given almost two months before he was in custody for unrelated crimes, was just being checked and his fingerprints were compared *after* the last short inquiry for details of his alibi.

2. This is not a case in which the police took a person into custody, failed to inform him of his rights, questioned him insistently until incriminating evidence or some other lever was obtained, and then belatedly gave the *Miranda* warnings just before the virtually foregone conclusion of obtaining a formal confession. The defendant voluntarily supplied the false alibi at an initial non-custodial, general investigatory meeting on December 8 before the investigation had focused on one suspect. No further contact occurred until nearly two months later. The polygraph examination after which he confessed was not arranged until after the defendant had been given the time to consult an attorney and indicated he had. The police did not focus on the defendant until after the fingerprints were checked and matched on February 16—two and one-half months after the initial non-custodial conversation—and from that point on full and complete *Miranda* warnings were given. There is no indication that the defendant was confronted with evidence contradicting his alibi or was in any other way coerced into taking the polygraph examination. That examination was preceded by *Miranda* warnings as was his subsequent confession to Officer Dean. The defendant's initial false alibi was of his own doing and any connection between it and his

ultimate confession was internally generated, not police-generated.

3. Nor is this a case in which the police have isolated the defendant from counsel or have grilled the defendant in such a way that the ultimate giving of the *Miranda* warnings prior to obtaining a confession was a meaningless gesture. The evils associated with persistent, continuous, incommunicado interrogation are not present in this case. The police questioned the defendant, but not in any continuous overbearing or menacing way. The discussions were separated by long stretches of time during which the defendant could contact friends, relatives, or an attorney. He was given the time to seek the advice of counsel.

4. There is no evidence of a causal connection between the defendant's false alibi and his confession, but if there was a connection it was generated by the defendant, not the police. The alibi was given in a pre-custodial, pre-focus, general investigation and cannot fairly be said to have resulted from either improper or coercive police conduct. The confessions were each made by the defendant after receiving full warnings of his constitutional rights, including his right to stop the questioning at any time, consult a lawyer, or walk out of the room. With the discussion about counsel, plus his considerable previous experience with the police and courts, it is not believable that defendant did not know he had a right to retained or appointed counsel. In fact, the defendant led the police to believe that he had sought the advice of a lawyer and was following his advice. This is not the kind of police behavior addressed by *Miranda* and its progeny as causing a person to confess under compulsion.

Reversed and the conviction is reinstated.

Justice Levin, joined by Chief Justice Kavanagh, dissented. He wrote that because the rule of law stated in *Miranda* applies without regard to whether a defendant's confession is voluntary and that rule was violated, the decision of the Court of Appeals should be affirmed and the case remanded for a new trial.

1. The requirement that the defendant be advised of his rights by *Miranda* warnings before being questioned when he is in custody applies even if he is in custody on another charge than the one about which he is being questioned. Whether the investigation has focused on the accused goes to the issue whether a defendant who is not incarcerated is in custody for purposes of the warning requirement. In this case the defend-

ant was in jail on another charge when all the interviews but the first were conducted.·

2. Considering false alibi statements made by the defendant and the circumstances in which they were made on the occasions before he was advised of his rights in deciding whether the confessional statements should be suppressed was not error. A court is obliged to consider all relevant evidence in assessing whether a confessional statement should be suppressed, and the circumstance that some of that evidence consists of statements that might themselves have been suppressed but were admitted without objection does not affect their relevance or competence or abridge the scope of the record to be considered.

3. In this case the pre-warning questioning at the county jail appears to have been a significant factor in bringing about the defendant's post-warning confession. In that questioning he had given a false alibi and then elaborated on it, and when he was persuaded to submit to a polygraph examination it was unlikely that he would pass because of the falsity of the alibi. During the examination he was told that he had not passed, and eventually he made a full confession. What caused the examining officer to tell him he had not passed does not appear, but the false alibi appears to have played a substantial role in his decision to confess.

4. The defendant's statements that he had consulted counsel and that counsel had advised him not to take a polygraph examination, while false, indicate a reluctance to talk to a detective and undergo a polygraph examination. Had he been fully advised of his rights he may very well have exercised them, thereby requiring the suspension of further questioning. While the confession *may* have been voluntary in the traditional sense, a purpose of *Miranda* was to reduce the number of cases in which the courts would be called upon to determine whether the pressures inherent in custodial questioning together with other factors such as the age and education of the defendant require suppression of a confessional statement on the ground that it was involuntary. The defendant, a relatively young man who had not graduated from high school, appears on the record in the case to be particularly susceptible to the kinds of psychological pressures at which the advice-of-rights requirement was primarily directed. Suppression of the statements was required by the policy and purpose of that requirement.

64 Mich App 374; 236 NW2d 80 (1975) reversed.

OPINION OF THE COURT

1. CRIMINAL LAW — ADVICE OF RIGHTS — INVESTIGATION — SPECIFIC-
   ITY.

   The deciding factor for determining in each case when *Miranda*
   warnings must be given before questioning is an examination
   of the specificity of the investigation, *i.e.,* whether the investi-
   gation has focused on one suspect.

2. CRIMINAL LAW — ADVICE OF RIGHTS — FOCUS OF INVESTIGATION.

   *Miranda* warnings were not improperly omitted by police before
   questioning a defendant where the police officer claimed, and
   the trial court found, that the investigation of a murder did not
   focus upon the defendant until his fingerprints were compared
   with those at the scene of the murder, after that no questions
   were asked prior to *Miranda* warnings, the investigation before
   then appears to have been general and routine, polygraph tests
   were given to a number of people and whereabouts of acquaint-
   ances were being checked, there is no reason to disbelieve the
   police officer in charge or to second-guess the trial court, and
   the defendant's alibi, given almost two months before he was
   taken into custody for unrelated crimes, was just being checked
   and his fingerprints compared *after* a last short inquiry for
   details of his alibi, well after he was taken into custody.

3. CRIMINAL LAW — ADVICE OF RIGHTS — CONFESSIONS — OTHER
   STATEMENTS — CAUSAL RELATIONSHIPS.

   A defendant's initial false alibi was of his own doing and any
   connection between it and his ultimate confession was inter-
   nally generated, not police-generated, where the defendant
   voluntarily supplied the false alibi at an initial non-custodial,
   general investigatory meeting before the investigation had
   focused on one suspect, no further contact occurred until nearly
   two months later, the polygraph examination after which he
   confessed was not arranged until after the defendant had been
   given the time to consult an attorney and indicated he had, the
   investigation did not focus on the defendant until after the
   fingerprints were checked and matched 2-1/2 months after the
   initial non-custodial conversation, and from that point on full
   and complete *Miranda* warnings were given, and there is no
   indication that the defendant was confronted with evidence
   contradicting his alibi or was in any other way coerced into
   taking the polygraph examination, which was preceded by
   *Miranda* warnings as was his subsequent confession.

4. CRIMINAL LAW — CONFESSIONS — COERCION.

   The evils associated with persistent, continuous, incommunicado
   interrogation as causing a person to confess under compulsion

are not present where the police questioned the defendant, but not in any continuous overbearing or menacing way, the discussions were separated by long stretches of time during which the defendant could contact friends, relatives, or an attorney, and he was given the time to seek the advice of counsel.

5. CRIMINAL LAW — ADVICE OF RIGHTS — ASSISTANCE OF COUNSEL.
   It is not believable that a defendant did not know he had a right to retained or appointed counsel where he discussed legal counsel with the police officer questioning him and had considerable previous experience with the police and courts, and led the police to believe that he had sought the advice of a lawyer and was following his advice.

DISSENTING OPINION BY LEVIN, J.

6. CRIMINAL LAW — CUSTODY — INVESTIGATION — ADVICE OF RIGHTS.
   *The requirement that an accused in custody be advised of his rights by* Miranda *warnings before being questioned applies even if he is in custody on another charge than the one about which he is being questioned.*

7. CRIMINAL LAW — ADVICE OF RIGHTS — FOCUS OF INVESTIGATION.
   *Whether the investigation has focused on the accused does not determine whether advice of rights by* Miranda *warnings before questioning is required, but rather goes to the issue of custody for purposes of the warning requirement.*

8. CRIMINAL LAW — CONFESSIONS — ADMISSIBILITY — OTHER STATEMENTS.
   *All relevant evidence must be considered in deciding whether a confessional statement should be suppressed; that some of the evidence consists of statements that might themselves have been suppressed but which were admitted without objection does not affect their relevance or competence or abridge the scope of the record to be considered in deciding the admissibility of statements duly objected to, and it is proper to consider them.*

9. CRIMINAL LAW — CONFESSIONS — OTHER STATEMENTS — CAUSAL RELATIONSHIP.
   *A significant causal relationship existed between a confession made by an accused after he was advised of his rights by a* Miranda *warning and statements made in several interviews in jail before he was warned to require suppression of the confession where, in the pre-warning interviews, the accused had*

*given a false alibi to a detective and then elaborated on it, and the accused confessed after being told that he had not passed a polygraph examination which he had reluctantly consented to take.*

10. CRIMINAL LAW — CONFESSIONS — CUSTODY — COERCION.

*A primary purpose of requiring that an accused be advised of his rights by* Miranda *warnings before questioning while in custody was to reduce the number of cases in which courts would be called upon to determine whether the pressures inherent in custodial questioning together with other factors such as the age and education of the defendant require suppression of a confessional statement on the ground that it was involuntary.*

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Edward G. Durance,* Prosecuting Attorney, for the people.

State Appellate Defender (by *John A. Lydick)* for defendant.

COLEMAN, C.J. *(to reverse).* After defendant had been given *Miranda*[1] warnings on each of two occasions on February 16, 1973, he waived those rights and confessed to manual strangulation of Peggy Smith. The first waiver was to State Police Sergeant Ronald Beauchine, who administered a polygraph test to defendant at defendant's behest, which, he said, was on advice of his lawyer. (In fact, he neither had retained counsel nor had he requested appointment of counsel, it was later discovered.) The second waiver immediately followed the polygraph test when defendant said he wanted to tell Officer Dean all about it. He again waived his *Miranda* rights.

The Court of Appeals (2 to 1) found that the brief exculpatory remarks made by defendant on and after January 31, 1973 were made after the investigation had focused upon defendant and

---

[1] *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694; 10 ALR3d 974 (1966).

should have been excluded *sua sponte* and that the trial judge erred in failing to grant the motion to suppress the two February 16 confessions. On motion of the defendant to suppress the confession, a *Walker*[2] hearing had been held and the motion to suppress the confessions was denied. There was no motion to suppress the exculpatory statements and no objection to the admission at trial. Based in important part upon a misstatement of fact, the majority held that the "totality of circumstances * * * did not satisfy the letter or spirit of the *Miranda* commandment". It reversed defendant's conviction of second-degree murder. The people appealed. We find that the facts do not support either the conclusions of law or policy enunciated by the Court of Appeals majority and so reverse and reinstate the conviction.

I

The sequence of dates and pertinent occurrences are necessary to a viable conclusion. A careful reading of the record reveals these facts—which are not always precisely in accord with those appearing in the opinion of Justice LEVIN.

December 1, 1972: Peggy Smith was found dead, having been manually strangled while alive as evidenced by hemorrhaging on the skin, the protruding tongue, bleeding from the nose and the fractured cartilage below the voice box.[3] There was, however, a rope around her neck.[4]

---

[2] *People v Walker (On Rehearing)*, 374 Mich 331; 132 NW2d 87 (1965).

[3] Dr. Leaby's testimony.

[4] In his confession, defendant said he placed the rope around the neck in an effort to make the death appear to be suicide. He found the rope in the garage of the deceased. The fact that there was part of the bed sheet between the rope and the neck supported this statement.

December 8, 1972: Defendant came to the police station in response to a telephone request in a general inquiry of persons who had known the deceased. At this time, defendant gave his alibi. He said, in summary, he had been in Tawas for ten days. Because Mrs. Smith had a broken fingernail and some matter under the nail, defendant's torso was examined. No marks were found. (Later, the lab reported that the matter was not skin.) Defendant said he would take a polygraph test. Note that the alibi was given in this non-custodial, pre-focus inquiry. Many acquaintances of the deceased were being questioned and offered polygraph tests. At least five such tests were given to others than defendant.

January 31, 1973 (morning): Defendant, in jail on several other unrelated charges, "had a statement to give" to Officer Dean regarding a juvenile in the unrelated matter.[5] The officer "went over" to take the statement. At the end of the interview, Officer Dean "casually" asked if there was anything else defendant could tell him about Peggy Smith. (He had not seen Brannan in almost two months.) Defendant said there was not. The officer left. This is said to be the *first* in-custody, warningless interrogation about the Smith case. Officer Dean was never questioned as to whether he had advised the defendant of his *Miranda* rights at this discussion. As a result, the record is devoid of testimony on this point.

January 31, 1973 (afternoon): After leaving defendant, Officer Dean learned that defendant's mother had advised the police that a clothesline was missing. (The missing rope was later proved not connected with the murder.) Officer Dean re-

---

[5] Testimony of Patrick L. Dean in the hearing on the motion to suppress.

ported this fact to defendant who said he knew nothing about the rope. Defendant was asked if he still was willing to take a polygraph test and he indicated negatively but would want to talk to a lawyer first. The officer promptly departed. This was designated the *second* in-custody questioning. (The officer denied that the investigation had focused on defendant and the facts support such a denial.) The trial court record is unclear as to whether Officer Dean gave defendant *Miranda* warnings before this conversation. In preliminary hearing, the officer was asked if he had advised defendant of "any rights before [he] talked to him this second time". The officer answered "yes". Later, at a suppression hearing, defense counsel phrased his question differently and asked if the officer had advised defendant of his rights when he "talked to" defendant "regarding the Peggy Smith matter". The officer indicated he had not.

February 7, 1973: Officer Dean merely asked defendant what his lawyer had advised regarding the polygraph test. Defendant said his attorney, Oscar Baker, Jr., had advised against it. Nothing more was said. The officer was not questioned as to *Miranda* "warnings". This is designated the *third* warningless in-custody questioning.

February 15, 1973: Defendant was given a polygraph test at the State Police Post in Bay City on a charge unrelated either to the Smith case or the breaking and entering.[6] He was questioned about another murder; Officer Dean went to listen. Defendant passed the test. At the end, Officer Dean asked for some details to check in defendant's alibi in the Smith case. Defendant gave some "names". Again the record is barren of inquiry as to whether the routine *Miranda* warnings were given

---

[6] Brannan had been transported by the State Police.

prior to the state police polygraph. There was no question on the point—possibly because it did not seem important. The officer had tried to reach Mr. Baker and failed. The secretary knew nothing of defendant. (In fact, Mr. Baker knew nothing of defendant.) At this time, the police were trying to check out the alibi which they did not know either to be true or false. The record reveals no reason to have disbelieved the alibi or even to have found it shaky.

This was said to be the *fourth* in-custody inquiry without *Miranda* warnings or without a repeat of them, if given before the polygraph. This inquiry also was believed by the Court of Appeals to have been made after focus was upon defendant as the murderer, although Officer Dean denied this. Indeed, the police had not even been suspicious enough to match defendant's fingerprints with those at the scene of the murder and were only commencing to check the alibi. Officer Dean also had not been suspicious enough to check on the rope. Polygraphs were being given to others and their stories also checked. Prime suspects apparently were the ex-husband of the deceased who had been at the house and with whom she had had intercourse on the evening of the murder, another whom deceased had telephoned and who had been in the house and one seen in the vicinity.

February 16, 1973: Officer Dean checked further on defendant's alibi and asked for a lab check of defendant's fingerprints. They matched those found on the premises. The time and date of the match were stamped on the lab report. This discovery was made *after* the inquiry above, lending credibility to the assertion that the focus had not evolved upon defendant at the time of the February 15 incident. There is no doubt, however, that

defendant became suspect in the police investigation after his fingerprints were matched. In error, the Court of Appeals based its opinion of "focus" as of February 15 in great part upon the misbelief that Officer Dean knew of the fingerprint identification at that time. He did not. The prints had not been matched.

February 16, 1973 (later in the day): Officer Dean was told that Brannan wanted to take a polygraph test. The prosecutor asked the officer to transport defendant to the Bay City State Police Post. There are no allegations that Officer Dean made any reference to the Smith case or polygraph during the transporting. (He said he did not.) He turned defendant over to Sergeant Ronald Beauchine, who testified in the suppression hearing as follows:

"I advised Mr. Brannan that he had a right to remain silent. I advised him that anything he said could be used against him. I advised him that he had a right to have an attorney present before any questioning. He could talk with an attorney before we—before I questioned him. I also advised him that if he could not afford an attorney one would be appointed to represent him at no cost before any questioning. I asked him—I also told him that he could stop talking to me any time he wanted to. I told him he could get up and leave the room at any time he wanted to. I asked him if he understood what his rights were. He stated that he did. And in regards to an attorney, he advised me that he had talked to a Mr. Baker, and Mr. Baker informed him to take the polygraph examination. He stated that he was willing to talk with me in regards to the murder of Peggy Smith."

Defendant confessed to the murder. When Brannan said that he wanted to tell Officer Dean all

about it, the officer repeated the *Miranda* warn-
ings and defendant again confessed the murder.

## II

The case has been cast in the perspective of
defendant's youth (defendant was 18 at the time of
trial), his lack of a high school diploma, his pro-
pensity to lie and improper, coercive police interro-
gation. Defendant's age, education and propensity
to lie[7] are not denied. (Appellate defense counsel
claimed that defendant was a "pathological liar".)
On the other hand, the record discloses a person
well acquainted with courts and police. Aside from
his problems as a juvenile and his placement in a
boy's residential facility, he had been committed,
for breaking and entering, to Camp Pugsley, an
adult Corrections Department facility. The psy-
chologist, Dr. Sophie Lovinger, testifying for the
defense, stated regarding Brannan:

"He really doesn't have a conscience. He has no
feelings of guilt that most of us have that prevent us
from doing the things that we know are wrong."

In short, Mr. Brannan has been cast as a young,
not highly educated, inexperienced innocent who
was coerced by the police into making a confes-
sion. Also, the police somehow should have known
that defendant was lying—first by telling Officer
Dean about his attorney's advice against a poly-
graph test and next by telling Sergeant Beauchine
that his attorney advised him to take the poly-

---

[7] For example, in court, defendant denied the truth of his confes-
sions, saying he went to the house of deceased after his mother read
to him the story of Mrs. Smith's murder. To the surprise of counsel,
he then changed his testimony. He said he went in before it was light
(maybe 7 or 8 a.m.) and found her dead.

graph when, in fact, he had retained no attorney nor had he asked that one be appointed—despite the several advisements of his right to retained or appointed counsel.

The "improper", "coercive" activities of Officer Dean are easily summarized as:

1. He asked defendant if he could tell him anything else about Peggy Smith (upon initiation by defendant Officer Dean had just concluded an interview with Brannan on another matter. This was a casual question at the end.) Defendant said he did not. (Between December 8, 1972 and January 31, 1973, no further inquiry of defendant had been made so far as the record reveals.)

2. After defendant's mother reported a missing clothesline, the officer told defendant about it. (Defendant said—truthfully—that he knew nothing about it.) The officer asked about the polygraph which defendant earlier had said he would take and the matter was dropped when defendant replied negatively, but left the door open for advice of a lawyer.

3. Officer Dean checked back to see if a decision had been made about the polygraph. Defendant said his attorney advised him not to take the test.

4. After defendant took (and passed) a polygraph test in Bay City in an unrelated matter, the officer asked for some details of the alibi to be checked in the Smith matter. Defendant gave him some "names".

The totality of these short remarks both by the officer and Brannan (two at the end of questioning on other matters) reveals no coercive behavior and no inculpatory statements. The officer claims, and the trial court found, that the investigation did not focus upon defendant until February 16 when his fingerprints were compared with those at the

scene of the murder. After that, no questions were asked prior to *Miranda* warnings.

However, the Court of Appeals opinion misstates a crucial fact in finding that the defendant was "a prime suspect" before the inquiry in number 4 above. The majority opinion says:

"Palm prints of the defendant had been obtained at the scene of the crime. He must have been a prime suspect."

The prints were not matched until *after* the last inquiry at the State Police Post.

The investigation appears to have been general and routine. Polygraph tests were being given to a number of people and whereabouts of acquaintances were being checked. There is no reason to disbelieve the officer in charge or to second-guess the trial court. Defendant's alibi as stated almost two months before he was in custody for the unrelated crimes was just being checked and his fingerprints compared *after* the last short inquiry noted above (after the unrelated polygraph test). As we stated in *People v Reed,* 393 Mich 342, 357; 224 NW2d 867 (1975), when determining when *Miranda* warnings must be given:

"[T]he 'deciding factor, in each case, is determined by examining the specificity of the investigation, *i.e.,* whether the investigation has focused on one suspect.' "

### III

This is not a case in which the police took a person into custody, failed to inform the person of his rights, questioned him insistently until incriminating evidence or some other lever was obtained

and then belatedly gave the *Miranda* warnings just before the virtually foregone conclusion of obtaining a formal confession. The defendant voluntarily supplied the false alibi at the initial non-custodial, pre-focus general investigatory meeting on December 8. No further contact occurred until nearly two months later. The critical polygraph was not arranged until after the defendant had been given the time to consult an attorney and indicated he had. The police did not focus on the defendant until after the fingerprints were checked and matched on February 16—two and one-half months after the initial non-custodial conversation—and from that point on full and complete *Miranda* warnings were given. There is no indication that the defendant was confronted with evidence contradicting his alibi or was in any other way coerced into taking the polygraph examination. That examination was preceded by *Miranda* warnings as was his subsequent confession to Officer Dean.

The defendant's initial false alibi was of his own doing and any connection between it and his ultimate confession was internally generated, not police-generated.

Nor is this a case in which the police have isolated the defendant from counsel or have grilled the defendant in such a way that the ultimate giving of the *Miranda* warnings prior to obtaining a confession was a meaningless gesture.

*Westover v United States,* 384 US 494; 86 S Ct 1638; 16 L Ed 2d 735 (1966), decided together with *Miranda,* is an example of the kind of case in which the giving of *Miranda* warnings is not enough to render a confession admissible. The defendant in that case was arrested at 9:45 p.m. by state authorities in connection with two local rob-

beries. He was jailed and interrogated that night and interrogated throughout the next morning until noon without any advice as to his rights. He was then turned over to Federal authorities for interrogation about a different crime. The Federal authorities did advise the defendant of his rights and obtained a confession a few hours later. The United States Supreme Court said the confession was erroneously admitted by the trial court because "we cannot find that Westover knowingly and intelligently waived his right to remain silent and his right to consult with counsel * * *. [F]rom Westover's point of view the warnings came at the end of the interrogation process". *Id.,* 495-496. The Court added, however:

"A different case would be presented if an accused were taken into custody by the second authority, removed both in time and place from his original surroundings, and then adequately advised of his rights and given an opportunity to exercise them. But here the FBI interrogation was conducted immediately following the state interrogation in the same police station —in the same compelling surroundings." *Id.,* 496.


## IV

In applying the *Miranda* decision, it is important to remember the context in which it was decided.

The Fifth Amendment to the United States Constitution assures us that "[n]o person * * * shall be compelled in any criminal case to be a witness against himself". In 1964, Manuel Escobedo had been denied a request to speak to his retained counsel (and vice versa) while the police interrogated him, handcuffed and standing for four hours until he confessed murder. The confession

was admitted into testimony and Escobedo was convicted. The United States Supreme Court reversed, finding the confession inadmissible as being obtained under compulsion.[8]

In speaking of the four consolidated cases which followed *Escobedo,* now generally known as *Miranda,* the Court noted that in each case, "the defendant was thrust into an unfamiliar atmosphere and run through menacing police interrogation procedures". It also noted that "such an interrogation environment is created for no purpose other than to subjugate the individual to the will of his examiner". It also said that the entire thrust of those warningless police interrogations was to "put the defendant in such an emotional state as to impair his capacity for rational judgment".[9] Emphasis was placed on the evils associated with persistent, continuous, incommunicado interrogation.

Those evils are not present in this case. The police questioned the defendant, but not in any continuous overbearing or menacing way. The discussions were separated by long stretches of time during which the defendant could contact friends, relatives or an attorney. He was given the time to seek the advice of counsel.

## V

In summary, if there was a causal connection between the false alibi and the confession, it was self-generated, not police-generated. (There is no evidence of such a connection.) The alibi was given in a pre-custodial, pre-focus, general investigation of many people and cannot fairly be said to have

[8] *Escobedo v Illinois,* 378 US 478; 84 S Ct 1758; 12 L Ed 2d 977 (1964).

[9] *Miranda, supra,* 457, 465.

resulted from either improper or coercive police conduct.

Examined separately, and collectively, the four short pre-confession, in-custody encounters of Brannan with the police while he was in jail for the unrelated crimes were at different times and one at a different place (Bay City). Two followed questioning concerning two other crimes and were short and not coercive or threatening. It is difficult to estimate with a high degree of accuracy but judging from the testimony, all pre-confession, in-custody conversations about the Smith case probably totalled no more than 20 to 30 minutes, at most. None of Brannan's remarks were inculpatory. The investigation had not focused upon him.

After defendant's palm prints were found by the lab to match some on the premises no more conversation was held with defendant excepting a general one while transporting defendant to the polygraph he said his attorney had advised him to take.

The Court of Appeals erroneously believed the palm prints had been matched before the February 15 conversation in Bay City and so found "focus" at that time. However, at no time after the lab results was there any inquiry or conversation with defendant about the Smith case until the *Miranda* warnings were given prior to the confessions.

The confessions were each made after receiving full warnings of his constitutional rights, including his right to stop the questioning at any time, consult a lawyer, or walk out of the room.

With discussion about counsel cited above, plus his considerable previous experience with the police and courts, it is not believable that defendant did not know he had a right to retained or ap-

pointed counsel. In fact, the defendant led the police to believe that he had sought the advice of a lawyer and was following his advice.

In total perspective, this is not the kind of police behavior addressed by *Miranda* and its progeny as causing a person to confess under compulsion.

Reversed and the conviction is reinstated.

Williams, Fitzgerald, and Ryan, JJ., concurred with Coleman, C.J.

Levin, J. Herbert Steven Brannan was convicted of second-degree murder.

The victim's body was found in her home on December 1, 1972. The cause of death was strangulation.

Between December 8, 1972 and February 15, 1973, Brannan, a 17-year old with a ninth-grade education, was questioned by a police detective five times without receiving *Miranda*[1] warnings. All but the first interview took place in the county jail where Brannan was being held on an unrelated charge. Brannan was apprised of his *Miranda* rights during a sixth interview on February 16th, which took place at the state police post to which he had been taken for a polygraph test. During the examination, and again immediately thereafter, Brannan gave a confessional statement.

The Court of Appeals held that inculpatory and exculpatory statements given by Brannan, except during the first interview when he was not in custody, should have been suppressed, and remanded for a new trial.

In reversing, this Court states that "[i]n total perspective, this is not the kind of police behavior

---

[1] *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694; 10 ALR3d 974 (1966).

addressed by *Miranda* and its progeny as causing a person to confess under compulsion".

Because the rule of law stated in *Miranda* applies without regard to whether a defendant's confession is voluntary and that rule was violated, we would affirm the Court of Appeals and remand for a new trial.

## I

Brannan, an acquaintance of the victim's son and of the victim, received a telephone call from a police detective requesting an interview. At the police station on December 8, 1972, Brannan told the officer he had been out of town for the preceding ten days. What was thought to be skin had been found under the victim's fingernails, and Brannan submitted to an examination of his upper torso. No scratches or other tell-tale marks were discovered. The detective asked Brannan to take a polygraph examination and Brannan said he was willing to do so. No *Miranda* warnings were given.

The second interview took place on the morning of January 31, 1973 in the county jail where Brannan was in custody on an unrelated possession of stolen goods charge. The officer, after questioning Brannan regarding the stolen goods charge, questioned him about the murder. Brannan reiterated that he was out of town and gave the names of persons who could corroborate his alibi. No *Miranda* warnings were given.

Later that day, the officer was informed by Brannan's mother that a piece of clothesline fitting the description of the rope found around the victim's neck was missing from the Brannan home. The officer returned to Brannan's cell and confronted him with this evidence. Brannan claimed he knew nothing about the rope; it was

ultimately determined that the rope around the
victim's neck was not the clothesline missing from
the Brannan home. The officer renewed his sugges-
tion that Brannan submit to a polygraph examina-
tion. Brannan told him that he wished first to
consult with a lawyer. No *Miranda* warnings were
given.

A fourth interview took place one week later,
February 7, 1973, again in the county jail. Bran-
nan informed the officer that his lawyer had ad-
vised him not to take a polygraph examination.
Brannan named his lawyer, a prominent member
of the local bar. Actually, Brannan had not con-
sulted or retained a lawyer. No *Miranda* warnings
were given.

The fifth interview took place February 15th.
Brannan was asked "for more details and if he
could be more specific" about his alibi. He supplied
additional information. No *Miranda* warnings
were given.[2]

---

[2] In reference to the first interview, at the police station on Decem-
ber 8, 1972, the detective said:

"*Q.* Therefore you did not advise him of any kind of Constitutional
rights?

"*A.* No."

In reference to the third interview (the second and third interviews
both having taken place on January 31st), he said:

"*Q. Had* you advised him of his rights at this time?

"*A.* No.

"*Q.* This is the third time that he was—talked to you regarding the
Peggy Smith matter and you *still* hadn't advised him of any kind of
rights?

"*A.* That's correct." (Emphasis supplied.)

Turning to the fourth and fifth interviews, it does not specifically
appear that Brannan was not advised of his rights before the fourth
interview, but that is a fair inference from the response regarding the
fifth interview:

"*Q.* Now, this would be the fifth time you talked to him. At this
time did you advise him of any rights?

"*A.* No.

"*Q.* Why not?

"*A.* I just wanted his alibi, where he had been at."

The detective testified that on the morning of February 16th he received a call from the prosecutor who told him that Brannan was now willing to take a polygraph examination. The record does not indicate how the prosecutor obtained this information.

Before administering the polygraph examination, a state police officer advised Brannan of his *Miranda* rights. During the examination, which lasted 2-1/4 hours, Brannan made inculpatory statements. He subsequently signed a waiver of rights and gave a confessional statement.

The trial judge denied a motion to suppress the confession, saying that Brannan was not a "firm suspect" until February 16th and had voluntarily waived his rights before confessing.

The Court of Appeals concluded that Brannan's in-custody statements should have been suppressed because of the failure to give *Miranda* warnings until immediately before the polygraph examination.

## II

The people contend that the investigation had not focused on Brannan until shortly before the polygraph examination and therefore there was no need to give *Miranda* warnings.

In *People v Reed,* 393 Mich 342; 224 NW2d 867 (1975), the defendant was questioned in his own apartment and the issue was whether he was in custody for *Miranda* purposes. In deciding that he was, the Court addressed the question whether the investigation had focused on the accused.[3]

It accordingly appears that the detective acknowledged specifically that he had not advised Brannan of his rights before the first, third or fifth interviews, and it is reasonable to infer that no such advice was given before the second and fourth interviews.

[3] In *Miranda* the Court declared:

In this case, Brannan was in jail, although on another charge, when all the interviews but the first were conducted. The United States Supreme Court has held that *Miranda* applies although the defendant is being held on a charge other than the one about which he was questioned and gave a statement. "We find nothing in the *Miranda* opinion which calls for a curtailment of the warnings to be given persons under interrogation by officers based on the reason why the person is in custody." *Mathis v United States,* 391 US 1, 4-5; 88 S Ct 1503; 20 L Ed 2d 381 (1968).[4]

## III

Brannan's suppression motion was directed to the confessional statement, not specifically to the false alibi statements. The prosecutor contends

---

"* * * By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.[4]

"[4]This is what we meant in *Escobedo [v Illinois,* 378 US 478; 84 S Ct 1758; 12 L Ed 2d 977 (1964)] when we spoke of an investigation which had focused on an accused." *Id.,* p 444.

[4] See, also, *Michigan v Mosley,* 423 US 96, 98; 96 S Ct 321; 46 L Ed 2d 313 (1975), where the Court declared that the defendant had been arrested in connection with certain robberies and subsequently was questioned solely about an unrelated murder for which he "had not been arrested". The issue was whether a confessional statement regarding the murder was admissible. The Court held that although the defendant had invoked his *Miranda* rights when questioned about the robberies, under the circumstances of the case it was not a violation of *Miranda* to have subsequently questioned him, after full *Miranda* warnings, regarding the murder. The Court said:

"We therefore conclude that the admissibility of statements obtained after the person *in custody* has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.' " *Id.,* p 104 (emphasis supplied).

Implicit in the Court's statement and analysis is that although Mosley had not been arrested on the murder charge, he was, for purposes of *Miranda,* in custody in respect to that or any other charge, and therefore he could not have been questioned on that charge without *Miranda* warnings.

that the Court of Appeals therefore erred in considering the alibi statements in deciding whether to suppress the confessional statements.[5]

Brannan duly objected to the admission of the confessional statements. A *Walker*[6] hearing was conducted. In assessing whether a confessional statement should be suppressed a court is obliged to consider all relevant evidence. The circumstance that some of that evidence consists of statements that might themselves have been suppressed but which were admitted at the trial without objection does not affect their relevancy or competency or abridge the scope of the record to be considered in deciding the admissibility of statements duly objected to.

While Brannan's failure to object to the admission of the alibi statements might be regarded as a waiver of his right to object to their admission, the Court of Appeals did not err in considering those statements and the circumstances in which they were given in deciding whether the subsequent confessional statements should be suppressed.

IV

The prosecutor relies on cases where courts concluded that confessional statements need not be suppressed simply because the defendant had earlier, without being adequately warned of his rights, made incriminating statements. *Mapys v United States,* 409 F2d 964 (CA 10, 1969); *Commonwealth v Greene,* 456 Pa 195; 317 A2d 268 (1974); *Commonwealth v Marabel,* 445 Pa 435; 283

---

[5] For the reasons stated, we find it unnecessary to decide whether Brannan's objection to the confessional statements encompassed the exculpatory statements.

[6] *People v Walker (On Rehearing),* 374 Mich 331; 132 NW2d 87 (1965).

A2d 285 (1971); *United States v Trabucco,* 424 F2d 1311 (CA 5, 1970).

In *United States v Trabucco* the Court declared that a "significant causal relationship [between the pre-warning statement and the post-warning confession] will bring the confession within the *Miranda* exclusionary rule". *Id.,* p 1319. The issue was similarly analyzed in the other pertinent cases relied on by the prosecutor, where it was held only that a confession will not be suppressed because of pre-warning inculpatory statements absent such a significant causal relationship.[7]

---

[7] In those cases, the courts concluded that other factors caused the defendant to confess.

In *Mapys v United States,* 409 F2d 964, 966 (CA 10, 1969), "[h]is statements were made in an attempt to assist his brother and to avoid a prosecution in state court".

In *Commonwealth v Greene,* 456 Pa 195, 198; 317 A2d 268, 270 (1974),

"appellant never suggested that her statement to Williams played any part in motivating her later admissions. On the contrary, it appears that the thing uppermost in her mind was remorse for her attack on Brock, whose death she learned about for the first time from McDonald. The minimal psychological impact of her statement to Williams can be gauged from the fact that at trial she could not remember what, if anything, she had told him when he appeared in her living room."

In *Commonwealth v Marabel,* 445 Pa 435, 448; 283 A2d 285, 291 (1971),

"the record indicates the actual cause of appellant's confession was the police confronting him with the information given by Cranshaw and Boyd which identified appellant as the driver of the getaway car (this was after he had been given proper warnings). Thus, the genesis of the confession was not the use of any illegally obtained statements from the appellant's own lips, rather it was information obtained from a totally separate, independent, and legitimate source."

In *United States v Trabucco,* 424 F2d 1311, 1319 (CA 5, 1970), the court said:

"We conclude that it was the discovery of the Sheraton stationery with Bravo's name, irretrievably linking Trabucco to Bravo, that convinced him he might as well confess. Being caught in the prevarication, if a factor at all, was not significant."

Since we conclude that in the instant case there was a significant causal relationship between the pre-warning statement and the post-warning confession, we need not consider whether in a case where there is no such significant causal relationship the confession must

In the instant case the questioning at the county jail appears to have been a significant factor in bringing about Brannan's confession. In the course of the warningless questioning Brannan gave a false alibi. During subsequent interrogations, upon the detective's request, he elaborated, providing details.[8] He knew that the alibi was false, and that ultimately the police would determine it was false unless they earlier became convinced of his innocence.

Brannan, although he had indicated a reluctance to do so, was persuaded to submit to a polygraph examination.[9] Because of the falsity of

nevertheless be suppressed on *Miranda* grounds (fn 10, *infra*, and accompanying text) or on pre-*Miranda* involuntariness grounds. In this connection, we note that in distinguishing the cited cases from the instant case we do not necessarily adopt the analysis or decisions of those cases.

[8] The Court states: "The defendant's initial false alibi was of his own doing and any connection between it and his ultimate confession was internally generated, not police-generated."

While Brannan's "initial false alibi" was given before he was in custody, he then told the police only that he had been in Tawas. After he was in custody, in response to the detective's questions, he gave the names of persons who could corroborate his alibi and at a subsequent interview supplied the detective with additional information.

While Brannan's decision to respond and the nature of his response was indeed his, and is not attributable to the police except insofar as the detective questioned him after he was in custody without first giving *Miranda* warnings, the issue, as stated in *United States v Trabucco*, 424 F2d 1311, 1319 (CA 5, 1970), is whether there is a significant causal relationship between the pre-warning statement and the post-warning confession.

The elaborations on the alibi, made after Brannan was in custody, provided the police with information that would enable them to determine that it was false. Although the police did not generate Brannan's "initial false alibi", they did generate his providing an alibi and, after he was in custody and without first giving *Miranda* warnings, his providing elaborations on it. The "connection" between those elaborations and his ultimate confession is acknowledged in the prosecutor's closing argument, quoted in the accompanying text, *infra*.

[9] A number of other suspects had been given polygraph examinations.

The American Law Institute's Model Code of Pre-Arraignment Procedure (Proposed Official Draft, 1975), § 140.5, p 45, provides:

his alibi it was unlikely that he would pass a polygraph examination. During the examination, Brannan was advised that he had not passed, and thereafter made false or inculpatory statements which were followed by a full confession.

While it does not appear whether the falsity of his alibi was revealed during the polygraph examination or whether it was some other discrepancy which caused the examining officer to advise him that he had not passed the examination, the false alibi appears to have played a significant role in Brannan's decision to confess. In his closing argument the prosecutor said as much:

"We know now that on the 8th of December, thereabouts, he gave a false alibi as to where he was. He informed the officer at that time, on first interview, that he was out of town for ten days and just got back. Ten days, of course, on the 8th of December being long enough to cover the date of the offense.

"*Subsequently, on February the 15th, he elaborated on this alibi by providing persons that he was with,* at least one person that he was with. It is interesting, in respect to that, and I kind of noted here that in respect to the defendant's testimony, that [the detective] would find out about the false alibi and he seemed to, in some way, project this as somehow discovering the falsity of his confession, and I inserted it here because I suspect that *it explains the confession.*

"*Knowing that on the 15th the officer has returned and asked him to detail about this alibi he had given him,* being in Tawas on the 8th of December, that that is *what he realized would be discovered, and the futility*

---

"No law enforcement officer shall seek to obtain information from an arrested person by using drugs or hypnosis, or a polygraph test or other such procedure designed to determine the truthfulness of statements by body reactions, unless, after such procedure has been proposed, such person has had an opportunity to consult with counsel for a period adequate to obtain advice concerning such procedure and has consented thereto."

*of denying his involvement in the death."* (Emphasis supplied.)

Our conclusion that there is a significant causal relationship between the pre-warning statements at the jail and the post-warning confessions makes it unnecessary for us to consider whether the warnings, given to Brannan after he had been persuaded to agree to speak, came too late.[10]

---

[10] In *Miranda v Arizona, supra,* pp 461, 465, the Court declared:

"We are satisfied that all the principles embodied in the privilege apply to informal compulsion exerted by law-enforcement officers during in-custody questioning. An individual swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to the techniques of persuasion described above *cannot be otherwise than under compulsion to speak.* As a practical matter, *the compulsion to speak* in the isolated setting of the police station may well be greater than in courts or other official investigations, where there are often impartial observers to guard against intimidation or trickery.

\* \* \*

"\* \* \* The entire thrust of police interrogation there [in *Escobedo*], as in all the cases today, was to put the defendant in such an emotional state as to impair his capacity for rational judgment. The abdication of the constitutional privilege—the choice on his part to speak to the police—was not made knowingly or competently because of the failure to apprise him of his rights; the compelling atmosphere of the in-custody interrogation, and not an independent decision on his part, caused the defendant to speak." (Emphasis supplied.)

In *Westover v United States,* a companion case decided with *Miranda (Miranda v Arizona, supra,* pp 494-497) the defendant was arrested by local police as a robbery suspect and interrogated without advisory warnings of any kind for a lengthy period. He was then interrogated by the FBI regarding the robbery of a savings and loan association and of a bank. After 2-1/2 hours he confessed. The Court concluded that the confession should be suppressed although there were two separate law enforcement authorities and the crimes were different. "[T]he impact on him was that of a continuous period of questioning"; "from Westover's point of view the warnings came at the end of the interrogation process"; "the federal authorities were the beneficiaries of the pressure applied by the local in-custody interrogation." The Court declared: "A different question would be presented if an accused were taken into custody by the second authority, removed both in time and place from his original surroundings, and then adequately advised of his rights and given an opportunity to exercise them."

In *Michigan v Mosley, supra,* pp 106-107, the Court said that *Westover* was inapplicable because, among other factors, "full '*Mi-*

## V

*Michigan v Tucker,* 417 US 433; 94 S Ct 2357; 41 L Ed 2d 182 (1974), dealt not with the admissibility of a confessional statement obtained from the defendant, but the admissibility of the testimony of an alibi witness named by the defendant during the interrogation before he had been fully warned of his rights. The admissibility of a statement given by the defendant himself was not involved. "[T]he respondent did *not* [emphasis in original] accuse himself. The evidence which the prosecution successfully sought to introduce was not a confession of guilt by respondent, or indeed even an *exculpatory statement by respondent* [emphasis supplied], but rather the testimony of a third party who was subjected to no custodial pressures." *Id.,* p 449.

In the instant case, in contrast with *Tucker* and *Michigan v Mosley,* 423 US 96; 96 S Ct 321; 46 L Ed 2d 313 (1975), where the Court emphasized the apparent good faith of the officer, there was no advice whatsoever to Brannan of his rights.[11] The failure to advise him of his rights does not seem to

*randa* warnings'" had been given to Mosley "at the very outset of *each* interrogation [emphasis supplied.]" "The cardinal fact of *Westover*—the failure of the police officers to give any warnings whatever to the person in their custody before embarking on an intense and prolonged interrogation of him—was simply not present in this case."

See *State v Callihan,* 320 So 2d 155 (La, 1975); *Fisher v Scafati,* 314 F Supp 929 (D Mass, 1970).

[11] Although Tucker was questioned before *Miranda* was decided, the police had advised him that any statement he might make could be used against him in court. He was not advised that counsel would be furnished without cost to him if he could not pay for such services himself.

Mosley was given full *Miranda* warnings before each questioning session.

See, generally, Stone, *The Miranda Doctrine in the Burger Court,* 1977 Sup Ct Rev 99; Anno: *The Progeny of Miranda v Arizona in the Supreme Court,* 46 L Ed 2d 903.

have been inadvertent. Brannan was questioned five times over a period of weeks by an experienced detective without any advisory warnings. It is difficult to imagine a more purposeful violation of the *Miranda* requirements.

Brannan's statements that he had consulted counsel and that counsel had advised him not to take a polygraph examination, although false, indicate that he was reluctant to talk to the detective and to undergo a polygraph examination. Had he been fully advised of his rights he may have exercised them, thereby requiring the officer to suspend further questioning. *Michigan v Mosley, supra.*

While Brannan's confession *may* have been voluntary in the traditional sense, a purpose of *Miranda* was to reduce the number of cases in which courts would be called upon to determine whether the pressures inherent in custodial questioning together with other factors such as the age and education of the defendant require suppression of a confessional statement on the ground that it was involuntary.[12] Brannan, a relatively young man at the time, who had not graduated from high school, appears on this record to be particularly susceptible to the kinds of psychological pressures at which *Miranda* was primarily directed.[13] The Court

---

[12] *Miranda v Arizona, supra,* pp 456-457.

[13] "Again we stress that the modern practice of in-custody interrogation is psychologically rather than physically oriented. As we have stated before, 'Since *Chambers v Florida,* 309 US 227 [60 S Ct 472; 84 L Ed 716 (1940)], this Court has recognized that coercion can be mental as well as physical, and that the blood of the accused *is not* the only hallmark of an unconstitutional inquisition.' *Blackburn v Alabama,* 361 US 199, 206; 80 S Ct 274; 4 L Ed 2d 242 (1960). Interrogation still takes place in privacy. Privacy results in secrecy and this in turn results in a gap in our knowledge as to what in fact goes on in the interrogation rooms." *Id.,* p 448.

"The officers are told by the manuals that the 'principal psychological factor contributing to a successful interrogation is *privacy*—being alone with the person under interrogation." *Id.,* p 449 (emphasis in original).

of Appeals correctly concluded that suppression of the statements was required by the policy and purpose of the *Miranda* decision.[14]

We would affirm the judgment of the Court of Appeals suppressing the confessional statements and remanding for a new trial, and directing that at a new trial such statements and other statements, inculpatory and exculpatory,[15] given while Brannan was in custody without *Miranda* warnings, shall not be admitted.

## Kavanagh, J., concurred with Levin, J.

"Even without employing brutality, the 'third degree' or the specific stratagems described above, the very fact of custodial interrogation exacts a heavy toll on individual liberty and trades on the weakness of individuals." *Id.,* p 455.

"In these cases, we might not find the defendants' statements to have been involuntary in traditional terms. * * * To be sure, the records do not evince overt physical coercion or patent psychological ploys. The fact remains that in none of these cases did the officers undertake to afford appropriate safeguards at the outset of the interrogation to insure that the statements were truly the product of free choice." *Id.,* p 457.

"This atmosphere carries its own badge of intimidation. To be sure, this is not physical intimidation, but it is equally destructive of human dignity. * * * Unless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice." *Id.,* pp 457-458.

[14] We note, although it is not pertinent to disposition, that on full examination of this record it appears that the evidence implicating Brannan is, to say the least, inconclusive. Also, there are a number of discrepancies between Brannan's confession and the known facts. Some of the facts of which he was aware may have become known to him as a person who had been in the victim's home a number of times, and a number of the details of the crime were a matter of local gossip in taverns frequented by Brannan and others. The considerations just mentioned have, indeed, no relevance in the disposition of this case. *Cf. Haynes v Washington,* 373 US 503, 518; 83 S Ct 1336; 10 L Ed 2d 513 (1963); *Rogers v Richmond,* 365 US 534, 541; 81 S Ct 735; 5 L Ed 2d 760 (1961). We advert to them simply to emphasize that this is not a case where one could properly say, whether or not pertinent, that the confessional statement bears its own earmarks of authenticity or that the defendant would have been convicted without the confession.

[15] *Miranda v Arizona, supra,* pp 444, 477.

BLAIR MOODY, JR., J., took no part in the decision of this case.