PEOPLE v WALLACH

Docket No. 49312. Submitted April 8, 1981, at Lansing.—Decided
    October 6, 1981.
    John D. Wallach was convicted of two counts of first-degree
        murder, Oakland Circuit Court, Robert L. Templin, J. Defen-
        dant appeals, alleging several errors. *Held:*
        1. Defendant asserts that a statement he made to police prior
    to being advised of his *Miranda* rights should have been sup-
    pressed. The deciding factor in Michigan for determining when
    *Miranda* warnings should be given is the extent to which the
    investigation has focused on a suspect. Based upon the totality

REFERENCES FOR POINTS IN HEADNOTES
[1] 21A Am Jur 2d, Criminal Law § 793.
    Necessity of informing suspect of rights under privilege against self-
        incrimination, prior to police interrogation. 10 ALR3d 1054.
[2] 21A Am Jur 2d, Criminal Law §§ 795, 797.
[3] 21 Am Jur 2d, Criminal Law §§ 408, 421.
    29 Am Jur 2d, Evidence § 278.
[4] 21A Am Jur 2d, Criminal Law §§ 715, 716, 951, 952.
    Witness' refusal to testify on ground of self-incrimination as justify-
        ing reception of evidence of prior statements or admissions. 43
        ALR3d 1413.
[5] 75 Am Jur 2d, Trial §§ 208, 266.
    Propriety and prejudicial effect of informing jury that accused has
        taken polygraph test, where results of test would be inadmissible
        in evidence. 88 ALR3d 227.
    Propriety and prejudicial effect of comment or evidence as to
        accused's willingness to take lie detector test. 95 ALR2d 819.
[6] 29 Am Jur 2d, Evidence § 783 *et seq.*
[7, 8] 40 Am Jur 2d, Homicide § 263 *et seq.*
[8] Presumption of deliberation or premeditation from the fact of
        killing. 86 ALR2d 656.
[9] 16A Am Jur 2d, Constitutional Law § 863.
[10] 81 Am Jur 2d, Witnesses §§ 438, 439.
    Admissability of hypnotic evidence at criminal trial. 92 ALR3d 442.
    Necessity and admissability, in federal trial of expert or opinion
        testimony regarding use or reliability of hypnotically refreshed
        recollections. 50 ALR Fed 602.
[11] 5 Am Jur 2d, Appeal and Error §§ 776-779.

of the circumstances, the statement complained of should have been suppressed.

2. Certain other statements of the defendant were not inadmissible by reason of having been given during a period of illegal detention. The defendant had been arrested on another charge. He was arraigned on the murder charge 12 days later, and in the interim had given statements to the police incriminating himself in the murders. His detention on the other charge was not illegal, however. The fact that a large cash bond was set with respect to the other charge does not mean that his arrest was for the murders.

3. The failure of the police to give complete *Miranda* warnings preceding an interrogation was not significant with regard to whether the defendant would have made the statements he did where, a few hours before, the defendant had been given a polygraph examination at his own request and at that time had been given complete *Miranda* warnings. The defendant knowingly and intentionally relinquished his rights under *Miranda.*

4. The delay in arraigning the defendant after his arrest on the murder charges was unnecessary and violated the statutory mandate of prompt arraignment. The delay does not require reversal, however, because the police did not use the delay to further their interrogation.

5. Testimony regarding statements of a witness later declared to be unavailable was properly excluded. They were statements against the interest of the witness which were not sufficiently corroborated by circumstances to indicate their trustworthiness and, therefore, did not fall into the exception to the general prohibition against hearsay.

6. A witness's mention of a "pre-test interview" was not a self-evident reference to a polygraph examination. The inadvertent reference is not grounds for reversal.

7. Photographs of the victims were not probative of premeditation and deliberation, as asserted by the prosecution. Their admission into evidence for that purpose was error.

8. Evidence of prior convictions was improperly admitted for impeachment purposes. Evidence of three of the convictions should have been automatically suppressed because of their age. Evidence of the others, obtained in Canada, should not have been admitted because the prosecution failed to sustain its burden of showing that those foreign convictions were obtained in a legal system which is fundamentally fair.

9. The memory of one witness had been refreshed through hypnosis. The trial court erred in admitting that portion of the

witness's testimony which she could recall only after the hypnosis. That portion of her testimony which she recalled without hypnosis was admissible.

10. The various errors which occurred do not require reversal. The errors were not so offensive to the maintenance of a sound judicial system that they can never be deemed harmless, the evidence was so overwhelming that even absent the errors no reasonable juror would have voted to acquit, and the cumulative effect of the errors did not result in the deprivation of a fair trial.

Affirmed.

1. ARREST — MIRANDA WARNINGS — FOCUS OF INVESTIGATION.

The deciding factor for determining whether *Miranda* warnings should be given to a suspect is the extent to which the investigation has focused on that suspect; this test is to be applied based upon the totality of the circumstances.

2. ARREST — MIRANDA WARNINGS — WAIVER OF RIGHTS.

The failure of the police to specifically inform a defendant of his right to have counsel present during questioning, while error, did not render inadmissible the defendant's statements during the ensuing questioning where only a few hours previously the defendant had, at his own behest, been given a polygraph examination before which he was concededly advised of all his rights and where it may be concluded that the defendant knowingly and intentionally relinquished his right to remain silent and to have counsel present.

3. ARREST — ARRAIGNMENT — DELAY IN ARRAIGNMENT — STATUTES.

The police must take a defendant before the most convenient magistrate without unnecessary delay upon arresting the defendant; the mere fact of a violation of this requirement does not necessarily mandate reversal of the defendant's conviction, however, and statements made by the defendant prior to arraignment are not excluded from evidence because of the delay unless it is found that the delay was employed by the police to extract the statements (MCL 764.13; MSA 28.871[1]).

4. WITNESSES — UNAVAILABLE WITNESSES — STATEMENT AGAINST INTEREST — RULES OF EVIDENCE.

A witness who elects not to answer questions, asserting his right not to incriminate himself, may be declared unavailable and a previous statement of the witness which is a statement against his interest may be admitted into evidence where corroborating

circumstances clearly indicate the trustworthiness of the statement (MRE 804[a][1], 804[b][3]).

5. CRIMINAL LAW — EVIDENCE — POLYGRAPH EXAMINATION.

Neither the fact of taking a polygraph examination nor the results thereof are admissible at trial; however, an inadvertent reference to a polygraph examination, not resulting in prejudice to a defendant, is not grounds for reversal of the defendant's conviction.

6. EVIDENCE — DEMONSTRATIVE EVIDENCE.

Demonstrative evidence such as photographs is admissible if it aids the factfinder in coming to a conclusion on a material matter in issue.

7. HOMICIDE — MURDER — PREMEDITATION AND DELIBERATION.

Premeditation and deliberation characterize a thought process undisturbed by hot blood and are supported by a time span sufficient for a second look between the initial thought and the ultimate action resulting in the killing.

8. HOMICIDE — MURDER — PREMEDITATION AND DELIBERATION.

The brutality of a killing does not itself justify an inference of premeditation and deliberation.

9. CRIMINAL LAW — PRIOR CONVICTIONS — IMPEACHMENT — FOREIGN CONVICTIONS.

The question in any case in which evidence of a prior foreign conviction of a defendant is offered for impeachment purposes is whether the foreign legal system lacks procedural protections necessary for fundamental fairness; the burden of showing the fundamental fairness of the specific legal system under which the defendant was convicted is on the prosecution.

10. WITNESSES — HYPNOSIS.

A witness whose memory has been restored or created through hypnosis may not testify about those incidents recalled only under hypnosis but may testify about those aspects of a case remembered prior to undergoing the hypnosis.

11. APPEAL — ERROR — REVERSIBLE ERROR.

Errors committed at trial do not require reversal of a defendant's conviction where they are not so offensive to the maintenance of a sound judicial system that they can never be deemed harmless, where the evidence was so overwhelming that even absent the errors no reasonable juror would have voted to

acquit, and where the cumulative effect of the errors did not result in the deprivation of a fair trial.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *L. Brooks Patterson,* Prosecuting Attorney, *Robert C. Williams,* Chief Appellate Counsel, and *Geoffrey H. Nickol,* Assistant Prosecuting Attorney, for the people.

*Cooper, Shifman & Gabe* (by *Philip H. Seymour),* for defendant on appeal.

Amicus Curiae:

*Terence R. Flanagan,* Assistant State Appellate Defender, for the State Appellate Defender's Office.

Before: CYNAR, P.J., and BRONSON and D. F. WALSH, JJ.

BRONSON, J. Defendant was charged with two counts of first-degree murder. MCL 750.316; MSA 28.548. Salvadore Gonzales was also charged with one of these counts. The pair were tried separately, however. Following a jury trial in the Oakland County Circuit Court, defendant was found to be guilty as charged. Thereafter, he was sentenced to two mandatory terms of life imprisonment. Defendant now appeals as of right.

On Sunday, January 28, 1979, two bodies were found buried in the snow next to a vacant house in Waterford Township. The deceased were later identified as Fred Torres and Elmer Evans. According to Dr. Robert Sillery, the Chief Medical Examiner for Oakland County, Torres died as a result of multiple stab wounds, and Evans had been beaten to death.

James Patrick Perry, Jr., testified that he was

living with Torres at the time of the latter's death and that he had been sexually involved with him. On Friday, January 26, 1979, he witnessed Torres pull a knife on defendant Wallach at the Liberty Bar and demand an apology for comments Wallach had made concerning Torres' homosexuality. The witness stated he talked Torres into putting the knife away. Thereafter, he heard defendant state that if Torres ever pulled a knife again he would make him eat it.

Nora Meston testified that she had lived with defendant in Canada during a part of 1978 when she was separated from her husband. Upon returning to her husband, she learned that she was pregnant by defendant and subsequently bore his child. Defendant was frequently allowed to visit the child and often slept overnight in his station wagon.

On Friday, January 26, 1979, defendant and his girlfriend, Rhonna Burns, were visiting at the Mestons' home. Defendant told Nora Meston that "this fag" had pulled a knife on him at the bar and that he was going to pay back "them mother-fuckers". Defendant kept repeating, "Nobody does this to me" and "Nobody gets away with it". The next day, defendant again told Meston he was going to get even with Torres and that he was going to talk with a Steven (Gonzales sometimes used this name) and a Chico.

Defendant and Ms. Burns left for the Liberty Bar at about 9:30 p.m. on January 27th. Nora Meston saw defendant again at approximately 5 a.m. on Sunday, January 28, 1979. She stated that it appeared as if he had been beaten. He had a cut on his right hand and blood on his pants. Defendant stated that he had injured his hand in a fight. Later, he told Meston that he had hurt his

hand smashing his car's windshield. On Sunday, defendant stated he would not have any more problems or anything to worry about because he had gotten even with Torres. During dinner, defendant stated that Torres and Evans were dead, that one had been stabbed and the other beaten. He did not say, however, that he was responsible for the pair's deaths. In February, 1979, defendant told Nora he would kill her if she repeated his comments. Robert Meston, Nora's husband, corroborated most of her testimony.

Rhonna Burns was allowed to testify over defense objections. These objections were based on the fact that Burns' memory had been hypnotically "refreshed" so that any testimony she gave would be tainted and inadmissible.

Ms. Burns stated that she witnessed the altercation between defendant and Torres at the Liberty Bar. She saw Torres pull a knife on defendant.

The next night, January 27, 1979, Burns and defendant returned to the Liberty Bar. During the course of the evening she saw defendant leave with Torres and a man who went by the name of Chico. Defendant returned about one and one-half hours later. Torres never returned.

Upon defendant's return, Burns was sitting at a table with Gonzales. While she talked to Gonzales, defendant went over to Elmer Evans and talked with him. Burns heard defendant suggest that he give Evans a ride home. Although Evans was apparently not interested in the ride, defendant kept insisting. Burns also indicated that although Evans did not want a ride, he was too drunk to drive himself. Eventually Gonzales came over and Evans gave him the keys to his car. Thereafter, defendant, Burns, and Evans, who had a glass of beer, got into defendant's automobile. Defendant

drove to the front of a building that looked like a warehouse. Gonzales was there, and he got into the back seat of the car and sat next to Evans.

Defendant drove the vehicle to a house which Burns thought belonged to Evans. Burns said she stayed in the car while the three men got out. Ten or 15 minutes later defendant and Gonzales returned; Evans did not. Defendant had blood on his pants and his hand was cut. Defendant and Burns dropped Gonzales off downtown. They then picked up Chico and took him home.

Burns indicated that later she and defendant returned to the Mestons' residence. Defendant retrieved a blanket and what appeared to be a shovel. Some time later, they returned to the house where they had dropped off Evans. Defendant took something out of the car and walked to the left. After defendant had been gone for a while, Burns stated that she got out of the car and walked around the house. There, she saw defendant shoveling snow on two corpses, including the body of Evans. Burns then related how the hypnotist had aided her in remembering the burying of the bodies.

Clifford Thompson, a detective with the Waterford Township Police Department, testified that he initially met defendant at the Liberty Bar on January 31, 1979. At this time, defendant gave the following account of what had transpired on January 27, 1979. He stated that on that night he was at the bar with a woman named Debbie McLaughlin. He saw Torres who asked him if he had seen a particular person. Defendant indicated that he had been in a fight with Torres the preceding Monday or Tuesday and that the altercation occurred over a name defendant had called Torres. Defendant explained that he received the deep cut

in his hand in another fight with a black male at the tavern on January 29, 1979.

On February 1, 1979, Detective Thompson received a call from defendant. The latter stated that he had given inaccurate information at the bar because he was afraid other people might overhear him.

Defendant's new version of the events in issue was that Torres came into the bar looking for Chico. Defendant told him that Chico was at another bar. He further stated that Chico had told him he would harm Torres if Torres did not leave him alone.

Thereafter, Detective Thompson received several further phone calls from defendant. At Detective Thompson's request, on February 5, 1979, defendant voluntarily brought his car into the police station so that the vehicle number could be examined. While checking the number, Thompson saw a large bloodstain on the seat and bloodstained slacks.

Upon making this discovery, Detective Thompson and Sergeant Werner interrogated defendant. This interrogation was preserved on tape. During the questioning, Thompson told defendant he was a "prime suspect". At this time, defendant stated the blood was caused by putting his fist through the windshield of the car owned by the black man he claimed to have been in a fight with. He also stated that he had spent Saturday night with a black man named Leon who lived at Park Lodge. During this interview Sergeant Werner told defendant he believed that "you're not quite telling the whole truth".

On March 9, 1978, Detective Thompson accompanied defendant to Lieutenant Robert Crider's office for a polygraph examination. After the inter-

view, defendant stated, "You've got me", and that he wanted to make a statement about the murders. Another taped interview was conducted at the Waterford Township Police Department. Defendant gave the following story during this interview. On Saturday night, Chico came into the Liberty Bar and told him that Torres wanted them to be friends. Chico and defendant drove the latter's car to where Torres was standing. Torres then pulled a knife on defendant and tried to stab him. However, defendant took the knife away and cut him. Defendant ultimately jumped in his car and drove away. He did not know if he killed Torres, whom he stabbed two or three times. However, he specifically denied having helped bury the body.

Defendant was also interviewed on March 9, 1978, by Lieutenant Crider of the Michigan State Police. At this time, defendant told yet another version of the events in question. According to defendant, Chico, Torres, and himself left the Liberty Bar on the night in question and went to the area where the two bodies were found. Torres told defendant he wanted to talk to him, but then pulled a knife. Defendant took the knife from Torres and stabbed him once or twice. Elmer Evans came onto the scene and, when he intervened, defendant hit him with his fist. Chico then jumped on Evans and started beating him. Defendant stabbed Torres two or three more times and after finishing him off, got into his car and left the scene.

Defendant testified in his own behalf. He admitted having an argument with Torres and that Torres had pulled a knife on him at the Liberty Bar. He denied killing either Torres or Evans, however. He also attempted to explain away the statements he had made.

Other facts will be discussed where relevant to specific issues.

We are presented with several difficult issues in this case involving *Miranda*[1] warnings, hearsay declarations against penal interest, the use of photographic evidence, the use of Canadian convictions for impeachment, and the status of a witness whose memory has been hypnotically refreshed. These claims will be discussed *seriatim.*

## I

Defendant initially asserts that a number of statements he gave were inadmissible. The first statement in issue was given on February 5, 1979, and defendant argues that, since he was not advised of his *Miranda* rights prior to questioning, the statement should have been suppressed.

During the interrogation of February 5, 1979, Detective Clifford Thompson told defendant that he was a prime suspect. At trial, Detective Thompson stated that he really did not believe defendant was a likely suspect in the killing. Instead, Thompson believed that defendant was just cooperating with the police to solve the murders. Detective Thompson explained that he told defendant he was a prime suspect to encourage his continued cooperation. Defendant had earlier expressed some reluctance to divulge information because he did not want people "on the street" to know he was aiding the police. During this interview, Detective Sergeant David Werner also indicated that he believed defendant was not being entirely honest.

The first problem we must address is what triggers the requirement that defendant be informed of his *Miranda* rights in Michigan.

[1] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694; 10 ALR3d 974 (1966).

In *People v Reed,* 393 Mich 342, 357-360; 224 NW2d 867 (1975), *cert den* 422 US 1044; 95 S Ct 2660; 45 L Ed 2d 696 (1975), the Michigan Supreme Court held that the deciding factor for determining whether *Miranda* warnings must be given is the extent to which the investigation has focused on one suspect. Subsequent to *Reed,* the United States Supreme Court decided *Beckwith v United States,* 425 US 341; 96 S Ct 1612; 48 L Ed 2d 1 (1976). *Beckwith* indicates that whether *Miranda* warnings must be given turns on whether the defendant has been taken into custody. This position was reaffirmed in *Oregon v Mathiason,* 429 US 492; 97 S Ct 711; 50 L Ed 2d 714 (1977). *Mathiason* further refined the concept of custody, stating that it occurs where there has been a significant restriction of the person's freedom. Following the decision in *Beckwith* by six weeks, but preceding *Mathiason,* the Michigan Supreme Court reaffirmed its intention to apply the focus test in *People v Ridley,* 396 Mich 603, 606-609; 242 NW2d 402 (1976).

The prosecution contends that in light of *Mathiason,* the focus test is untenable. There is no doubt that under the custody test, defendant was not in custody. Following *Reed, Ridley, Beckwith,* and *Mathiason,* controversy arose in this Court concerning whether the focus test propounded in the Michigan cases remained viable. In *People v Martin,* 78 Mich App 518; 260 NW2d 869 (1977), one panel of this Court, noting that state courts may not impose greater restrictions on police activity than the United States Supreme Court as a matter of federal constitutional law,[2] determined that *Beckwith* and *Mathiason* were controlling in Mich-

---

[2] See *Oregon v Hass,* 420 US 714; 95 S Ct 1215; 43 L Ed 2d 570 (1975).

igan. Accord, *People v Konke,* 83 Mich App 356; 268 NW2d 42 (1978), *People v Schram,* 98 Mich App 292, 306-307; 296 NW2d 840 (1980). In *People v Robinson,* 79 Mich App 145, 152-153; 261 NW2d 544 (1977), *lv den* 403 Mich 814 (1978), another panel of this Court indicated its intention to follow the focus test of *Reed* in light of *Beckwith.* In yet another case, *People v Hangsleben,* 86 Mich App 718, 724-725; 273 NW2d 539 (1978), the controversy was noted, but the Court found it unnecessary to resolve the dispute in the matter before it.

Despite the fact that *Beckwith* was decided before *Ridley,* the time span was short enough so that it would be reasonable to conclude that *Beckwith* had not been considered by the Michigan Supreme Court prior to reaffirming the focus test in *Ridley.* Consequently, *Martin, supra,* could be deemed as arguably meritorious. However, the focus test first enunciated in *Reed* was again cited approvingly by the Michigan Supreme Court in *People v Brannan,* 406 Mich 104, 118; 276 NW2d 14 (1979). In light of *Brannan,* any case holding that focus does not trigger the necessity of giving *Miranda* warnings in Michigan *(e.g., Schram, supra)* seems less meritorious than when this view was first expressed in *Martin, supra.* At the same time, *Brannan* fails to discuss either *Beckwith* or *Mathiason* and does not tie the focus test to an interpretation of the state constitution. Thus, we are left with two alternatives, either of which requires us to make an assumption about the reasoning of the Michigan Supreme Court. First, we could conclude that the Court was unaware of both *Beckwith* and *Mathiason* and really did not mean to impose a stricter test vis-à-vis Fifth Amendment rights as incorporated by the Fourteenth Amendment when it decided *Brannan.* Sec-

ond, we could assume, despite the lack of any affirmative indication in *Reed, Ridley,* or *Brannan,* that the Court did intend focus to be the trigger for *Miranda* rights in Michigan as a matter of state constitutional law. We opt for the latter alternative. It is inherently unlikely that the Michigan Supreme Court was not aware of *Beckwith* and *Mathiason,* decided in 1977 and 1978 respectively, when it continued to adhere to *Reed-Ridley* in *Brannan.* Second, the Court had to be aware of the problem at issue since leave to appeal from this Court was sought in *Robinson, supra,* by the prosecution.

Having determined that focus is the correct test to apply in Michigan, we must ascertain whether the investigation had so focused on defendant as a suspect that he should have been given *Miranda* warnings. We begin our discussion by noting that while *Reed, supra,* 360, propounds the focus test in terms of one suspect, such an application would be inappropriate in this case as the prosecution always believed that more than one person was involved in the killings.

The following facts support defendant's assertion that he was a suspect such that he should have been given *Miranda* warnings. Some time prior to February 5, 1979, Detective Thompson ran a LEIN check on defendant's vehicle. No explanation was given for doing this except that on some occasions such checks are run on even possible witnesses. The LEIN check indicated that there had been a misregistration of the vehicle's license plates. Consequently, defendant was asked to bring the car in so that the matter could be straightened out. While Detective Thompson was checking the vehicle identification number of defendant's car, he observed bloody clothes in the car as well as a bloodstain on the back seat.

At this time, Detective Thompson also knew about defendant's altercation with Fred Torres, that the pair had been playing cards on the night of Torres' death, and that defendant's hand was injured. During a previous interview, on February 2, 1979, Detective Thompson referred to defendant as a suspect. Additionally, Thompson indicated that "some strange blood" was found on the bodies and asked defendant what blood type he had. Thompson also requested that defendant allow him to take his fingerprints to be compared with latent prints discovered during the investigation. Thompson also asked some pointed questions concerning the fact that defendant had shaved off his beard.

During the interview of February 5, 1979, which was conducted at the Waterford Township Police Department, Detective Thompson asked defendant to submit to a polygraph examination. Additionally, defendant was told he was a "prime suspect". Finally, about midway through this interview, Detective Sergeant Werner indicated that he did not believe defendant.

The prosecution argues that some of the facts noted are ambiguous as regards whether defendant was the focus of the investigation. As noted above, Detective Thompson indicated that he told defendant he was a "prime suspect" to alleviate his fears about talking. Furthermore, Detective Thompson said he believed the blood may have been the result of a fight defendant had told him he had been in.

In none of the cases using the focus test does the Court provide an analytical framework with which to examine if there has been focus. Thus, the only way to apply the test is to compare and contrast the facts of this case with these other cases.

In *Reed, supra,* the police narrowed their investigation at the scene of a homicide to one apartment. The officers found two bodies in an alley and a trail of blood leading to the apartment house. After examining three of the four apartments inside the building, and finding nothing, they attempted to enter the fourth apartment. They were unsuccessful but defendant came along and put his key into the door of the fourth apartment. At this point, the officers asked if they could come in and were admitted. One of the officers stated that the apartment was obviously a narcotics pad. The dead bodies had exhibited signs of drug use. The police also saw a mop showing signs of red-tinged wetness and a pair of bloodstained trousers soaking in a bucket. One officer admitted that the defendant "perhaps knew something about" the homicide and "[m]ore than that perhaps". The Court held that the questions put to the defendant about his ownership of the slacks, rather than preliminary exploration, represented the "clincher". Focus had come to rest on the defendant.

In *Ridley, supra,* where the police officers' questioning was considered proper, the police had answered a radio run concerning a "B & E". At the scene there were four similar houses, each of which might be the burgled site. Some citizens pointed toward an alley. The police went into the alley, where defendant was parked with his motor running. The police officers told defendant that he was not under arrest and could leave at any time. They also stated that they were investigating a "B & E". Certain questions were put to the defendant. One of the officers stated that he was "just grabbing at straws".

In *Brannan, supra,* where no focus was found to have occurred, defendant was one of several per-

sons called by the police who knew the deceased. Defendant gave an alibi. Defendant was later arrested on unrelated charges. Various questions at various dates and times were then put to the defendant while he was in jail. However, the Court held that the investigation did not really focus on the defendant until his fingerprints were matched with those at the scene of the crime.

This case is unlike *Ridley,* because it is obvious that here the police were doing more than merely grasping at straws. They had a large body of information implicating defendant in the killings. If not a prime suspect, defendant was clearly a suspect. While in certain respects similar to *Brannan,* the case sub judice is different in certain salient respects. First, less evidence suggested Brannan was involved in the incident at the time of questioning than is true here. In *Brannan,* the prime suspects were the deceased's ex-husband and another man who had been seen in the house and vicinity. Second, the total interrogation time spent in all pre-*Miranda* warning questioning in *Brannan* was extremely minimal. Here, however, the interview of February 5, 1979, lasted some two and one-half hours. Moreover, the interview was more accusatory than investigatory. Particularly in light of Detective Sergeant Werner's assertion that he believed defendant was being deceptive, it seems clear that the officers believed that it was probable that defendant was involved in the killings. We conclude that the interview of February 5, 1979, was intended to obtain evidence against defendant and did not represent mere preliminary investigation. It is clear that defendant subjectively believed himself to be the focal point of accusation during the February 5, 1979, interview. Based upon the totality of the circumstances, we

conclude defendant's statements of February 5, 1979, should have been suppressed.

Defendant also argues that his statements of March 9 and March 12, 1979, were inadmissible because he gave these statements during a period of illegal detention. On March 1, 1979, defendant was arrested on an outstanding warrant for an ordinance violation in Pontiac, to-wit: sending obscene or threatening letters to Nora Meston. Defendant contends that the arrest on this charge was a mere pretext on which to take him into custody for murder. He argues that following his arrest on March 1, 1979, the prosecution had the duty to have him immediately arraigned on the murder charge. MCL 764.26; MSA 28.885 and MCL 764.13; MSA 28.871(1). Instead, defendant was not arraigned on the murder charge until March 12, 1979, following the giving of incriminating statements.

The pertinent circumstances surrounding defendant's arrest on the ordinance violation are as follows. Detective Thompson stated at a *Walker*[3] hearing that he had no knowledge of the warrant nor did he or the Waterford Township Police Department have anything to do with the arrest in Pontiac. Detective Thompson had earlier run a warrant check on January 31 or February 1, 1979. However, this check failed to uncover the "letters" warrant which had been issued on November 22, 1978.

The Pontiac Police Department notified Detective Thompson about the arrest. Thereafter, Thompson and Waterford Police Sergeant Richard Dorrance contacted the 50th District Court concerning the arrest. Thompson stated that Nora

---

[3] *People v Walker (On Rehearing)*, 374 Mich 331; 132 NW2d 87 (1965).

Meston had told Detective Sergeant Werner that defendant was leaving town on a rush basis and wanted to borrow $1,000 to get back to Canada. Detective Thompson told the district court of the information he had suggesting defendant might flee and also divulged information that he had about defendant's criminal record in Canada. Thompson suggested that a cash bond be required to ensure defendant's reappearance. The court was also informed of the murder investigation. Ultimately a $25,000 cash or surety bond was required on the ordinance violation. The City of Pontiac dismissed the charge on April 4, 1979. Both Detective Thompson and Sergeant Dorrance denied that they desired defendant to be incarcerated in order to obtain a confession.

We have little doubt that the large cash bond required on the ordinance charge was primarily a result of the murder investigation. However, this does not mean that the March 1, 1979, arrest can be construed as an arrest for murder. Although defendant contends that on March 1, 1979, the police had sufficient evidence to obtain an arrest warrant, on March 8, 1979, the Waterford police requested a warrant but were refused by Richard Thompson, Chief Assistant Prosecutor for Oakland County. As of March 8, then, whether there was probable cause to arrest defendant for murder was seriously in doubt.

Nothing in the record suggests that defendant would not have been arrested for the ordinance violation but for the murder investigation or that the charge was created to imprison defendant. While it is clear that but for the information Detective Thompson gave to the district court defendant's bond would have been lower than that imposed, this does not prove the higher bond was

imposed for impermissible purposes. DCR 2004,[4] which governed the setting of bail for misdemeanors at the time the $25,000 cash or surety bond was required in this case, stated that bail is to be set solely for the purpose of assuring defendant's appearance on the charge. Here, where defendant was aware of the murder investigation and had already indicated his intention of fleeing for Canada, there is every reason to believe the extraordinarily high bail bond was imposed precisely to assure defendant's appearance on the "letters" charge.

As noted above, the Oakland County Prosecutor's Office declined to issue a warrant for defendant's arrest on March 8, 1979. However, during the course of defendant's conversation with Chief Assistant Prosecutor Thompson, defendant demanded that he be allowed to take a polygraph examination to prove the truthfulness of his statements. On March 9, 1979, defendant was given a polygraph examination after having been advised of his *Miranda* rights. This examination was at his own behest and the incriminating statements he made then were admissible.

Defendant also asserts that statements he made at the Waterford Township Police Department on March 9, 1979, following the polygraph examination should be suppressed for the reason that he was not properly advised of his *Miranda* rights prior to questioning. We agree with defendant that the *Miranda* warnings he was given were incomplete and therefore inaccurate. It is evident that defendant was not apprised of his right to have an attorney present during questioning.

In *People v Ansley,* 18 Mich App 659; 171 NW2d

---

[4] Repealed June 29, 1979, as to traffic offenses occurring on or after August 1, 1979.

649 (1969), we reversed that defendant's conviction where we were confronted with the same incomplete *Miranda* warnings and that defendant's statements were used against him. See, also, *People v Lasley,* 21 Mich App 340; 175 NW2d 883 (1970) (BRONSON, J., dissenting), *rev'd* 383 Mich 787; 177 NW2d 621 (1970). What distinguishes this case from both *Ansley* and *Lasley* is that here defendant was given concededly complete *Miranda* warnings only a few hours prior to the interrogation in question. Detective Thompson's testimony at the *Walker* hearing reveals the posture in which this issue is raised:

"I started out with, 'John, since we have moved from the location where you took your polygraph over to our police station or at the Waterford Township Police Department to continue this interview, I want to again remind you that you do have your rights. I believe the polygraph operator went over them with you there, didn't he?' John answered, 'Yes or uh-huh.'

"Then I asked him, 'Okay, I want to just briefly touch on them again and refresh your memory a little bit. You do have the right to remain silent and the right to have an attorney. If you give up those rights, anything you say can and will be used against you in a court of law. If you cannot afford to appoint—if you cannot afford an attorney, we'll have one appointed. Do you understand each of these rights? Do you have any questions on them?'

"And then Sergeant Werner said, 'You realize, John, that you are here—you are here voluntarily?' and John answered, 'Yup.' "

While we certainly do not condone the rather cavalier attitude with which *Miranda* warnings were handled throughout this matter, we do not believe the failure of the police to specifically inform defendant of his right to have counsel during questioning before the second interrogation

on March 9 was of any significance vis-à-vis
whether defendant would have given the state-
ments in issue. Ultimately, we believe that defen-
dant did knowingly and intentionally relinquish
his *Miranda* rights. See *Biddy v Diamond,* 516 F2d
118, 122 (CA 5, 1975). *Cf. People v Tubbs,* 22 Mich
App 549; 177 NW2d 622 (1970).

Defendant finally argues in relation to his state-
ments that, even if he was not arrested on March
1, 1979, for murder, he was arrested on March 9,
1979, yet not arraigned until March 12, 1979.
Consequently, he argues, the police obtained the
March 12, 1979, statements by exploiting a period
of illegal confinement.

MCL 764.13; MSA 28.871(1) commands the po-
lice to take a defendant before the most conve-
nient magistrate without unnecessary delay upon
arresting that defendant. While defendant was
officially arrested on the murder charges on March
9, 1979, he was not arraigned until three days
later. As a threshold question, it must be deter-
mined if the statutory provision was violated in
the instant case. March 9, 1979, was a Friday, and
defendant was arraigned the following Monday.
However, in Michigan, magistrates are on duty for
arraignments 24 hours a day so that the fact that
it was a weekend does not excuse the police failure
to have defendant arraigned. *People v Hamilton,*
359 Mich 410, 417; 102 NW2d 738 (1960), *People v
Besonen,* 4 Mich App 131, 137; 144 NW2d 653
(1966). In *Hamilton, supra,* 416-417, the Court
stated that no unnecessary delay occurs where the
arraignment is put off to allow for a brief question-
ing of the suspect in order to determine whether
to release him or to make a complaint. In the
instant case, assuming, *arguendo,* that the three-
day delay could be characterized as "brief", it is

clear that the police had no intention of releasing defendant regardless of any subsequent statements he made. Since the police officers were not attempting to determine defendant's guilt or innocence during the period of delay, the delay in arraignment was unnecessary and violated MCL 764.13; MSA 28.871(1).

The mere fact of the statutory violation does not necessarily mandate reversal, however. In *People v White,* 392 Mich 404, 424; 221 NW2d 357 (1974), *cert den* 420 US 912; 95 S Ct 835; 42 L Ed 2d 843 (1975), the Court said:

"The statutes governing the arrest-arraignment process provide that after a defendant has been arrested on felony charges he shall be taken before a magistrate for arraignment 'without unnecessary delay.' MCLA 764.13, 764.26; MSA 28.871(1), 28.885. These sections, while straightforward in their command to the police, have not been interpreted by this Court or require the exclusion of every admission or confession obtained during a period of unreasonable delay. Only when the delay has been employed as a tool to extract a statement has an exclusionary rule been imposed under these sections."

As was the case in *White,* we cannot say that the trial judge was required to find that the police used the delay to further their interrogation.[5] This is particularly true in light of the statements

---

[5] Actually, in *White, supra,* it seems clear to us that the delay was employed to extract a statement. Thus, we agree with this Court's statement in *People v Antonio Johnson,* 85 Mich App 247, 253; 271 NW2d 177 (1978), that the real question is not one of delay, but whether the statement was coerced. If the delay was not perceived as coercive by defendant so that the statement was voluntary, violation of the arraignment statute, for whatever reasons, is insignificant. Accord: *People v Perryman,* 89 Mich App 516, 519-520; 280 NW2d 579 (1979), *People v Joyner,* 93 Mich App 554, 559; 287 NW2d 286 (1979). This view is in accord with *Hamilton, supra,* in which the Court found that delay in the arraignment was used to *coerce* a confession from defendant.

made by defendant on March 9, 1979. After the damaging March 9th statements the police had little incentive to attempt to extract further statements, for the reason that they were not needed.

## II

During the course of trial, defendant sought to introduce the testimony of Detective Joseph Zoch as to certain statements made by Douglas Holda which were against Holda's penal interests and tended to exculpate defendant. Originally, Holda told the police he committed the murders himself. Later, Holda stated that three other persons were involved in the murders and yet on another occasion said that two other persons were involved. Detective Zoch stated that there were some 26 discrepancies between the three statements. After hearing this testimony outside the presence of the jury, the trial court ruled Holda's statement—that he committed the murders himself—inadmissible under MRE 804(b)(3) since there was no indication that said statement was corroborated by surrounding circumstances. Defendant argues that it was error not to allow the statement.

For purposes of the Michigan Rules of Evidence, Douglas Holda was unavailable. When he was called by the defense to testify, he elected not to answer any questions, asserting his Fifth Amendment rights. See MRE 804(a)(1). MRE 804(b)(3) provides:

"(b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

\* \* \*

"(3) Statement against interest. A statement which was at the time of its making so far contrary to the

declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable person in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."

Prior to the adoption of MRE 804(b)(3), which is identical to FRE 804(b)(3) insofar as corroboration is concerned, the Michigan Supreme Court had held that corroboration was unnecessary and only went to the weight of the evidence. *People v Ernest Edwards,* 396 Mich 551, 565-566; 242 NW2d 739 (1976). Defendant, while noting MRE 804(b)(3), nonetheless relies heavily on *Ernest Edwards* as authority for what corroboration is required. Given that *Ernest Edwards* was decided on a 3-2 split by the Supreme Court, with two justices not participating in the decision, and given the adoption of MRE 804(b)(3), we do not believe that *Ernest Edwards* has any continuing vitality.

Defendant contends that the following indicia of trustworthiness required the statement to be admitted. First, disinterested witnesses identified Holda as being with the victims at a pizzeria shortly before their demise. Second, many items found at the scene were connected with Holda. Third, Holda resided approximately 100 yards from the murder scene. Fourth, Elmer Evans' wallet and checkbook were found in a brown suede jacket inside of Holda's home. Fifth, this jacket was stained with blood on the arms and front.

We agree with defendant that these facts "clearly indicate the trustworthiness" of statements implicating Holda in the crime. We dis-

agree, however, that they provide a clear indication of the trustworthiness of Holda's first statement to the effect that he committed the murders himself. In light of the conflicting statements given by Holda, and the lack of other circumstances corroborating a single killer theory, the trial court's ruling was correct. See *United States v Bagley,* 537 F2d 162, 167 (CA 5, 1976), *United States v Guillette,* 547 F2d 743, 754 (CA 2, 1976).

Defendant further argues that the corroboration requirement of MRE 804(b)(3) denies him due process of law in that it prevents him from preparing an adequate defense. In support of this position defendant relies almost entirely on *Chambers v Mississippi,* 410 US 284; 93 S Ct 1038; 35 L Ed 2d 297 (1973), or cases citing *Chambers.* However, *Chambers* does not stand for the proposition that exclusion of hearsay statements against penal interest is under all circumstances improper. Instead, *Chambers* holds that the exclusion of such statements where they have been corroborated as trustworthy and are critical to the defense can constitute a denial of due process. The issue in *Chambers* was whether a Mississippi rule prohibiting the use under all circumstances of hearsay statements against a declarant's penal interests could pass constitutional muster. This is not the problem we are presented with, and under the specific holding of *Chambers,* MRE 804(b)(3) would not be invalid.

## III

During direct examination of Lieutenant Crider, a polygraph examiner, he made reference to a "pre-test interview". Defense counsel moved for a mistrial on the basis that this reference, in conjunction with Crider's other testimony, had the

effect of informing the jury that defendant had been given a polygraph examination. The motion for mistrial was denied, and defendant contends that this denial constitutes error.

The rule in Michigan is that neither the fact of taking a polygraph examination nor the results thereof are admissible at trial. *People v Barbara,* 400 Mich 352; 255 NW2d 171 (1977), *People v Rodgers,* 66 Mich App 658; 239 NW2d 701 (1976). Nonetheless, it has been held on several occasions that an inadvertent reference to a polygraph examination, not resulting in prejudice to defendant, is not grounds for reversal. *Inter alia: People v Tyrer,* 19 Mich App 48, 51; 172 NW2d 53 (1969), *dismissed* 385 Mich 484; 189 NW2d 226 (1971), *People v Wright,* 58 Mich App 735, 749-750; 228 NW2d 807 (1975), *People v Scotts,* 80 Mich App 1, 11-13; 263 NW2d 272 (1977).

In the instant case, Lieutenant Crider did not specifically refer to a polygraph examination. Instead, he spoke of a "pre-test interview". These words are not a self-evident reference to a polygraph examination. Nothing in the record suggests that Lieutenant Crider deliberately attempted to inform the jury of the fact that defendant took a polygraph examination or that defendant was prejudiced by the reference to a "pre-test interview".

IV

The prosecution possessed numerous photographs of both victims. These photos depicted the pair as they were found lying dead in the snow and as they were being examined at the morgue. Prior to the onset of trial, defense counsel moved that the prosecution be prohibited from introducing these "particularly brutal photographs" into evidence. The trial court did not examine the

photographs and reserved a ruling on the motion until they were presented by the prosecution. During the testimony of Dr. Robert James Sillery, Chief Medical Examiner for Oakland County, he identified a photograph of victim Torres which "shows the [stab] wounds in the head area". Defense counsel renewed his objection; the trial court looked at the picture and admitted it into evidence. This process was repeated for all but one of the remaining photographs.

Demonstrative evidence such as photographs is admissible if it aids the factfinder in coming to a conclusion on a material matter in issue. MRE 401, *People v Eddington,* 387 Mich 551, 562-563; 198 NW2d 297 (1972), *People v Falkner,* 389 Mich 682, 685-686; 209 NW2d 193 (1973), *People v Turner,* 99 Mich App 733, 745; 298 NW2d 848 (1980).[6]

The prosecutor referred to the photographs in his closing argument, stating:

"I think a lot of us, fortunately, have never been associated in any way with this kind of tragedy. At the outset it's kind of hard to believe that any human being could treat another human being in a manner that would give rise to a charge of murder in the first degree.

"Well, you saw, and that's why I introduced pictures, and you have the testimony, because you've got to be able to re-feel what Torres and Evans felt as they were losing their lives. As Dr. Sillery says, they weren't dead right away. This was a lingering type of a death. That's why this is a first-degree murder case.

\* \* \*

"That's not all we learned from what I consider to be the scene. We had the medical examiner testify, and he,

---

[6] Assuming the materiality of the photos, the trial court still must weigh the potential prejudicial effects of the pictures against their probative value. MRE 403, *Eddington, supra.*

without telling us who did it, could help us draw some reasonable inferences from the evidence. He told us that Torres was beaten around the face, was cut around the face, his eyes blackened. You know, I showed you a picture of him, and I didn't show this picture of him so you'd get all mad and say, 'Let's go get the guy who did it.' No.

"I showed it to you because this is, first of all, what happened, and if you have to decide the facts, you're entitled to know what happened. But, I also wanted you to be able to see; and I also had to make sure that he's identified for purposes of the record in this particular case; what happened, so you could get an idea that this isn't sort of a sudden thing. Okay."

The prosecutor, on appeal, states in his brief:

"[T]he photographs at issue revealed that the victims suffered repeated blows of various types, and that at least one of the victims attempted to defend himself. They, therefore, suggest that there was time for their assailant(s) to take a 'second look'.

\* \* \*

"The existence of two bodies buried together suggests that they met their deaths at the hands of the same person or persons and, thus, sheds light on the premeditation and deliberation issue. The existence of two beaten victims buried together indicates that their assailant(s) most likely had time to take a second look."

We disagree with the assertion that the photographs were probative as tending to prove premeditation and deliberation. The pictures were equally consistent with a conclusion that the killings were the result of first-degree murder, second-degree murder, or voluntary manslaughter. Each of these verdicts was a possibility in this case.

Even if the photographs can be said to suggest some amount of time during the beatings giving the assailants a chance to reflect on their actions,

premeditation and deliberation characterize a thought process undisturbed by hot blood. *People v Vail,* 393 Mich 460; 227 NW2d 535 (1975), *People v Morrin,* 31 Mich App 301, 329-330; 187 NW2d 434 (1971), *lv den* 385 Mich 775 (1971), *People v Meadows,* 80 Mich App 680, 691; 263 NW2d 903 (1977). The photographs do not aid the jury in ascertaining whether an opportunity to reflect on the beatings, undisturbed by emotional excitement, was available to the killer. This, the photographs did not make it more likely that the killings constituted first-degree murder as opposed to some other type of homicide. The prosecution argument emphasizes an opportunity to take a second look *midway through the beatings* and not before they began. However, the nature of the second look to support premeditation and deliberation *is* a time span between the initial thought and ultimate action resulting in the killing. *People v Moncure,* 94 Mich App 252, 257; 288 NW2d 675 (1979). The photographs indicate nothing about the assailant's thought processes prior to the ultimate action nor at what point during the beatings the victims actually expired.

The fact that the killings were accomplished by repeated blows and stabbings—which is graphically depicted in the several photographs—does not make first-degree murder more likely than some other variety of homicide. In *People v Hoffmeister,* 394 Mich 155, 159; 229 NW2d 305 (1975), the Supreme Court quoted approvingly from La-Fave & Scott, Criminal Law, § 73, p 565:

"The brutality of a killing does not itself justify an inference of premeditation and deliberation. The mere fact that the killing was attended by much violence or that a great many wounds were inflicted is not relevant [on the issue of premeditation and deliberation], as such

a killing is just as likely (or perhaps more likely) to have been on impulse.' " (Footnote omitted.)

Accord, *People v Wells,* 87 Mich App 402, 410; 274 NW2d 797 (1978).

The fact that some of the photographs showed two persons buried in the snow also does nothing to make them probative of premeditation and deliberation. The fact that there were two victims, instead of one, indicates nothing about how the killings occurred or the mental state of the perpetrators. The burial of the victims, while possibly indicative of consciousness of wrongdoing by the killers, certainly was not of such a nature to suggest it was a step in a coherent scheme to kill. *Morrin, supra,* 332. The ambiguity of the action leaves these photographs with no tendency to make premeditation and deliberation "more probable or less probable". MRE 401.

Since defendant did not deny that the victims were brutally killed, but only his participation in the killings, the photographs were improperly admitted. They had no probative value in tending to establish first-degree murder as opposed to some other type of killing nor any value in rebutting defendant's defense. Moreover, at least some of the photographs, particularly the color shots, may well have had a tendency to inflame the jurors and distract their attention from truly probative evidence.

V

Prior to trial, counsel moved to prohibit the use of evidence of defendant's prior convictions for impeachment purposes. All of these convictions were obtained in Canada. The trial court ruled that the prosecution could use six convictions in-

volving theft and excluded convictions for escape from lawful custody and obstructing a police officer. Defendant argues that by allowing his impeachment with evidence of the convictions, the court committed reversible error.

Defendant first argues that the record does not clearly indicate that the trial court realized it had discretion to exclude evidence of theft offenses. See *People v Jackson,* 391 Mich 323; 217 NW2d 22 (1974), *People v Cherry,* 393 Mich 261; 224 NW2d 286 (1974). While it is true that the trial court never specifically stated that it recognized its discretion to exclude evidence of all convictions, regardless of their nature, it is also apparent that the court was aware of its discretion. The matter of admissibility was thoroughly discussed by the prosecutor and defense counsel in the presence of the trial court. Defense counsel argued for exclusion of evidence of the theft convictions. The prosecutor asked to be allowed to use the theft convictions for impeachment should defendant testify. Clearly, all arguments were premised on the trial court's having the power to exclude evidence of convictions if it desire. See *People v Joyner,* 93 Mich App 554, 560-561; 287 NW2d 286 (1979).[7]

Defendant also argues that in any case, the trial court abused its discretion in allowing the use of evidence of the convictions in question. Considered solely in light of the factors enunciated in *People v Crawford,* 83 Mich App 35, 38-39; 268 NW2d 275

---

[7] We find that the trial court's exercise of its discretion was adequate given the state of the law as it exised at the time of this trial. Under the amendment to MRE 609(a)(2), which was effective May 14, 1980, however, the trial court must articulate on the record the factors considered in determining that the probative value of the evidence of convictions outweighs their prejudicial effect on credibility. Had this trial occurred after May 14, 1980, the trial court's ruling on the evidence of prior convictions would have been inadequate.

(1978), and the factual determinations which the court would have to make in order to allow admission, we find no abuse of discretion.

We do find, however, that the trial court proceeded from erroneous legal principles in ruling on the motion. The first problem concerns the admissibility of evidence of three convictions obtained in May, 1969. Pursuant to MRE 609(b) a conviction is not admissible for impeachment where more than 10 years has passed since the date of conviction or release from confinement, whichever is later. Trial in this case was conducted in November, 1979. No confinement was imposed for the 1969 convictions. Consequently, evidence of the May, 1969, convictions should have been automatically suppressed.

The other problem with using evidence of the convictions for impeachment was their Canadian origin. While no previous Michigan case has ruled on whether evidence of foreign convictions can be used for impeachment purposes, a similar problem was considered in *People v Braithwaite,* 67 Mich App 121; 240 NW2d 293 (1976). In *Braithwaite,* this Court flatly held that evidence of a conviction under Canadian law would never be a permissible consideration in determining what sentence to impose. The prosecution contends that *Braithwaite* is distinguishable since it deals with sentencing. However, we are not prepared to say that it is more egregious to consider evidence of a foreign conviction for purposes of sentencing than it is to use the same conviction in the trial process. If anything, the latter is more offensive. To the extent that one is concerned about the fundamental fairness of the conviction rendered in the other country, it is certainly preferable to have evidence of that conviction considered in sentencing as opposed to admitting it during the trial where it

can affect the very integrity of any guilty verdict rendered.

We agree with the prosecution, however, that the blanket prohibition of *Braithwaite* should not be followed. The question in any given case should be whether the foreign legal system lacks procedural protections necessary for fundamental fairness. While few, if any, of the other legal systems in the world are as conscientiously dedicated to ensuring that the rights of the accused are as scrupulously honored as the various legal systems in the United States, many of these systems do provide substantial safeguards for the accused, making it inherently unlikely that innocent persons will be convicted of offenses which they did not commit. The problem of the use of evidence of foreign convictions involves a balancing of competing policy interests. On the one hand, we do not want to make use of evidence of convictions obtained in a system which is not fundamentally fair. On the other hand, we do not want miscreants to look upon Michigan as a sanctuary where their criminal activity in foreign countries can have no bearing on issues raised by new illegalities. If evidence of past convictions is relevant to impeach, as similar acts evidence, in sentencing, or otherwise, and the system in which they were rendered sufficiently safeguards the rights of the accused, there exists no compelling reason not to make use of evidence of these convictions, where appropriate.[8]

---

[8] In *Braithwaite, supra,* 122, the Court said:

"A conviction under Canadian law is not the same as a conviction in an American jurisdiction. We can properly take judicial notice of the fact that in many ways, the constitutional guarantees which our system of justice protects are different in both kind and degree than those recognized even in modern democratic systems such as Canada's. A conviction in a foreign jurisdiction may often have been impossible were the accused arrested, tried, and sentenced under the same standards as in the United States."

The prosecution cites us to two federal cases which place the burden on the defendant of establishing that the foreign legal system lacks the procedural protections necessary to guarantee fundamental fairness for the accused. *United States v Wilson*, 556 F2d 1177 (CA 4, 1977), *cert den* 434 US 986; 98 S Ct 614; 54 L Ed 2d 481 (1977), *United States v Manafzadeh*, 592 F2d 81 (CA 2, 1979). See, also, *State v Meyer*, 26 Wash App 119; 613 P2d 132 (1980). We are urged to follow this same procedure. At this point our views depart from those of the prosecution. In Michigan, the prosecution must sustain the burden of proof on the issue of whether evidence of a prior conviction can be used for impeachment purposes. *Inter alia: People v McCartney*, 60 Mich App 620, 625; 231 NW2d 472 (1975), *Crawford, supra,* 38; *People v Garth,* 93 Mich App 308, 314, fn 3; 287 NW2d 216 (1979), *lv den* 409 Mich 854 (1980). We see no reason to depart from this standard where admissibility of evidence of a prior conviction also hinges on the fundamental fairness of the foreign legal system. In the case sub judice, no showing was made by the prosecution that the specific legal system in which defendant was convicted is fundamentally fair. Therefore, it was error to allow the use of

---

If differences in procedural protections constituted a basis upon which to exclude the use of evidence of any conviction rendered in a foreign legal system, these same considerations would render evidence of convictions obtained in most of the legal systems of the United States unuseable in Michigan. Michigan constitutional law in many ways provides more stringent standards to safeguard the rights of the individual accused than do our sister states and the federal system. See, for instance, *People v Turner,* 390 Mich 7; 210 NW2d 336 (1973), *People v Nabers,* 103 Mich App 354, 375; 303 NW2d 205 (1981), MRE 801(d)(2)(B). Just as a conviction obtained in a foreign country might have been impossible to obtain were the accused arrested, tried, and sentenced in Michigan, the same can be said about certain convictions obtained in the United States federal courts or most state court systems.

evidence of the Canadian convictions for impeachment purposes.[9]

## VI

Defendant also asserts that the testimony of Rhonna Burns should have been excluded. The basis for this contention is that Burns' memory had been hypnotically "refreshed". In the related case of *People v Gonzales,* 108 Mich App 145; 310 NW2d 306 (1981), we held that a witness whose memory had been restored or created through hypnosis could not testify about those incidents recalled only under hypnosis. However, we left open the possibility that hypnosis could be used for investigative purposes so long as stringent safeguards in the hypnosis process were followed. Under our holding in *Gonzales,* a witness who had been hypnotized would not necessarily be precluded from testifying. Said witness could testify about those aspects of the case remembered prior to undergoing the hypnosis.

Unlike *Gonzales,* in which Burns could give no information implicating the defendant as a perpetrator of the murders prior to the hypnosis session, in this case, Burns could recall Wallach's being present with the victims of the murder in a bar and also that Wallach was at the murder scene on the night in question. She could not recall prior to the hypnosis session, however, seeing defendant with blood on his pants and a cut on his hand. She also could not recall prior to the hypnosis that she

---

[9] Even if the particular system is fundamentally fair, if a specific foreign conviction could not have been obtained in Michigan, the trial court should exclude use of evidence of the conviction for impeachment purposes. See *People v Vincent,* 94 Mich App 626, 631-633; 288 NW2d 670 (1980), *lv den* 409 Mich 857 (1980).

saw the bodies of the two victims or seeing defendant burying the victims with snow. In our opinion, it was error for the trial court to allow into evidence that portion of Burns' story which could be recalled only after the hypnosis.

Defendant would have us go further and hold that his constitutional right to confront and cross-examine the witnesses against him was violated on the theory that it would be impossible for a jury to assess Burns' credibility and demeanor as a witness after she had undergone hypnosis. There is some support for defendant's position in the legal-scientific literature on hypnosis. See Diamond, *Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness,* 68 Cal L Rev 313 (1980). Professor Diamond takes the position that because of the problem of a witness's developing subjective certainty of events following the hypnosis, a jury cannot properly weigh such a witness's testimonial recollections. As such, Diamond believes the hypnotized witness has become "contaminated" and should not be allowed to testify. We recognize that there may be some problems in this regard. However, we believe that full cross-examination, in which defense counsel can question the previously hypnotized witness concerning the tentativeness of the recollections prior to the hypnosis, will largely alleviate these problems. We would also allow the defendant to introduce expert testimony detailing the inherent possibility that a hypnotized witness might become subjectively certain of events only tentatively recalled or, indeed, recalled inaccurately. At present, however, no jurisdiction has taken the position that the mere fact that a witness has been hypnotized precludes *all* testimony from that witness. We decline to do so in this case.

## VII

We must finally ascertain if the various errors

in this case require reversal. We hold that they do not. While we concluded that defendant's February 5, 1979, statement should have been suppressed, this statement was less detrimental to him than several others properly admitted. We concluded that the photographs of the victims were not probative of any material fact in issue and, thus, should have been excluded from evidence. The introduction of the photos, in and of itself, was undoubtedly harmless precisely because they were not probative of any material fact in issue. The fact that the trial prosecutor based a portion of his closing argument on the improperly admitted photographs exacerbates the problem somewhat. Nonetheless, in light of the evidence properly admitted, this portion of the argument was undoubtedly insignificant. Finally, we held that evidence of defendant's May, 1969, convictions should not have been admitted because they were too old under MRE 609(b). Evidence of the other Canadian convictions was admissible to impeach only if the trial court determined in the first instance that the legal system under which defendant was convicted was fundamentally fair. However, but for *Braithwaite, supra,* we would be tempted to take judicial notice of the fundamental fairness of the Canadian system. The likelihood that evidence of the other Canadian convictions should have been suppressed as a matter of law is slim indeed.

These errors must be considered in the light of the very compelling evidence which was properly admitted. Defendant made numerous conflicting statements, in some of which he admitted his participation in the crimes. Additionally, the testimony of the Mestons strongly indicates that defendant was one of the murderers. Moreover, that

portion of Rhonna Burns' testimony which was properly admitted put defendant at the scene of the crime.

We are convinced that none of the errors are so offensive to the maintenance of a sound judicial system that they can never be deemed harmless. We also believe that the evidence was so overwhelming that even absent the errors no reasonable juror would have voted to acquit. *People v Bailey,* 101 Mich App 144, 152; 300 NW2d 474 (1980). We do not believe that the cumulative effect of the errors resulted in defendant's deprivation of a fair trial. See *People v McCoy,* 392 Mich 231, 240; 220 NW2d 456 (1974), *People v Skowronski,* 61 Mich App 71, 77; 232 NW2d 306 (1975).

Affirmed.