PEOPLE v MYERS

Docket No. 82964. Submitted December 4, 1986, at Lansing. Decided
February 18, 1987. Leave to appeal applied for.

Randy L. Myers was convicted of first-degree murder following a
jury trial in the Eaton Circuit Court. The trial court, Richard
M. Shuster, J., sentenced defendant to life imprisonment. De-
fendant appeals alleging four errors.

The Court of Appeals held:

1. The trial court did not err in denying defendant's motion
to suppress his confession made on April 5, 1984, because of the
failure to give Miranda warnings to him prior to an interview
with the police on March 30, 1984. Miranda warnings were not
required on March 30, 1984, under either the "focus" or "cus-
tody" standards for determining when such warnings are re-
quired.

2. The trial court did not err in ruling that defendant's April
5, 1984, confession was voluntary and admissible.

3. Any failure on the prosecutor's part to disclose to defense
counsel certain oral admissions of defendant which the prose-
cutor intended to use as evidence was harmless beyond a
reasonable doubt.

4. The trial court did not abuse its discretion in admitting
into evidence a blood-soaked shirt and blanket after finding the
evidence relevant and that the prejudicial effect of the evidence
did not outweigh its relevancy.

Affirmed.

REFERENCES

Am Jur 2d, Appeal and Error §§ 880 et seq.
Am Jur 2d, Criminal Law §§ 788-797, 967 et seq.
What constitutes "custodial interrogation" within rule of Miranda v
Arizona requiring that suspect be informed of his federal consti-
tutional rights before custodial interrogation. 31 ALR3d 565.
Comment Note.—Necessity of informing suspect of rights under
privilege against self-incrimination, prior to police interrogation.
10 ALR3d 1054.
See also the annotations in the Index to Annotations under Appeal
and Error.

1. Criminal Law — Assistance of Counsel — Custodial Interrogation — Waiver.

An accused who has expressed the desire to invoke the right to counsel is not subject to further custodial interrogation until counsel has been made available, unless the accused himself initiates further communication, exchange, or conversations with the police; three questions are asked by the Court of Appeals in reviewing an accused's claim of violation of this right: (1) did the accused communicate a request for counsel; (2) if so, did the interrogation by police stop at that point; and (3) if it did, did the accused afterwards, but before questioning resumed, waive his right to counsel.

2. Criminal Law — Assistance of Counsel — Custodial Interrogation — Waiver.

Further volunteered information is held to be a waiver of the right to counsel by an accused who speaks to the police during custodial interrogation after requesting counsel and before being asked any more questions concerning the crime where the response to the accused's request for counsel was that counsel would be obtained or was available or else the response was to give the accused the means to contact an attorney; additional statements by the accused do not constitute a waiver where the police respond that counsel is not available, without making any indication that counsel will be available in the immediate future.

3. Evidence — Relevant Evidence — Appeal — Rules of Evidence.

A trial court's exercise of discretion in determining certain evidence to be relevant and that its probative value is not substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence will not be overturned except for a clear abuse of discretion (MRE 403).

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *G. Michael Hocking,* Prosecuting Attorney, and *K. Davison Hunter,* Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *Karla K. Goodman*), for defendant on appeal.

Before: BEASLEY, P.J., and R. B. BURNS and G. D. LOSTRACCO,* JJ.

BEASLEY, J. Defendant, Randy Lee Myers, was convicted by a jury of murder in the first degree, MCL 750.316; MSA 28.548, and was sentenced to the mandatory life imprisonment provided in the statute. He appeals as of right, raising four issues.

First, defendant claims that the trial court erred in denying his motion to suppress his confession made on April 5, 1984, because he did not receive a *Miranda*[1] warning in a prior interview with the police on March 30, 1984. Prior to trial, a *Walker*[2] hearing was held on August 21 and 22, 1984, to determine whether defendant's April 5, 1984, confession should be suppressed. Defendant did not testify at the *Walker* hearing and stated to the court that he did not wish to testify.

On March 30, 1984, the police had interviewed defendant and he had told them that he knew nothing about the victim's death and gave them no information which would lead them to believe that he was involved in the homicide. In connection with that interview, a police detective testified that he interviewed defendant because the investigation at that time was focused on people defendant allegedly brought to the scene of the murder on the night before the murder. At the interview, defendant was not under arrest. However, during the interview on March 30, 1984, the name of Kim Gregg came up. On April 4, 1984, Gregg was brought in for questioning and confessed to having participated in the murder of the victim, giving a statement implicating defendant. On April 5, 1984,

* Circuit judge, sitting on the Court of Appeals by assignment.

[1] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[2] *People v Walker (On Rehearing)*, 374 Mich 331; 132 NW2d 87 (1965).

defendant was arrested and interrogated, after being given his *Miranda* rights. During this interrogation, defendant admitted that he stabbed the victim, after which a tape-recorded statement was taken, which was read to the jury during the testimony of the police detective.

On appeal, defendant claims that he was the focus of the murder investigation on March 30, 1984, and, therefore, should have been given *Miranda* warnings prior to his interview by the police. Because defendant supplied the police with Kim Gregg's name in his March 30, 1984, interrogation, he says that Gregg's statement on April 4, 1984, was the tainted fruit of illegal police action. Accordingly, defendant argues that there was a direct causal connection between such illegality and defendant's April 5, 1984, confession.

Finding that there was no connection between defendant's March 30, 1984, statement and his April 5, 1984, confession, the trial court also concluded that defendant's March 30, 1984, statement was given in the course of a criminal investigation and under circumstances that did not require defendant to be advised of his *Miranda* rights. The trial court specifically noted:

Further, the court finds: 1) It was not a custodial environment; 2) It was not a coercive environment; 3) There was no deprivation of freedom; 4) The Defendant was not under arrest; 5) The Defendant was not focused as the only suspect and the interview was not accusatory of him and permitted him to leave; and 6) The Defendant was apparently capable of fully comprehending and understanding the investigation interview, regardless of whether or not he had previously utilized a controlled substance.

Our review of the record reveals evidentiary support for the trial court's findings. While there has been some division of opinion in this Court

over whether to apply the "focus" standard[3] or the "custody" standard[4] to determine when *Miranda* warnings must be given, we believe that under either the focus or the custody standard defendant is not entitled to have the alleged fruit of his March 30, 1984, statement to the police suppressed because it was made without benefit of the *Miranda* warnings. On March 30, defendant was merely one of many people the police interviewed in connection with the victim's murder. At that time there was no evidence linking defendant to the killing, nor did the police appear to consider him a prime suspect. Also, he was not deprived of his freedom in any significant way. He was not under arrest and could have left the state police post at any time during his interview. Therefore, we do not believe that defendant was the focus of the murder investigation on March 30, 1984.

Review under the custody standard discloses that on March 30, 1984, defendant was not under arrest and voluntarily went to the state police post. While there, he was free to leave at any time. During the interview, defendant was not questioned in a continuous, overbearing way or in a menacing manner. Furthermore, after receiving defendant's permission to search his truck and prior to the search, the police allowed defendant to remove any illicit drugs that may have been in his truck. After the interview, the police did not appear to consider defendant a suspect and allowed him to leave the police post in his truck. Thus, we conclude that defendant was not in custody on March 30, 1984. If there was a causal connection between defendant's giving the police the name of Kim Gregg and defendant's confession (and we are not inclined to believe there was), it was not police

[3] *People v Wallach,* 110 Mich App 37, 48-50; 312 NW2d 37 (1981); vacated on other grounds 417 Mich 937 (1983).

[4] *People v Hill,* 152 Mich App 374; 393 NW2d 642 (1986).

generated.[5] Thus, we conclude that there was no error in denying defendant's motion to suppress his confession made on April 5, 1984, because of the failure to give *Miranda* warnings before his statement on March 30, 1984.

Defendant's second argument is that the trial court erred in ruling that his confession of April 5, 1984, was voluntary and admissible. Defendant's support for this argument is his claim that he validly asserted his right to counsel during the interrogation of April 5, 1984, but before he made his recorded confession. Defendant says that once this assertion of the right to counsel had been made, the police could no longer proceed in questioning him until and unless defendant spoke with an attorney.

The officers spoke with defendant for between thirty and forty-five minutes prior to turning on a tape recorder and obtaining defendant's confession. There are differing versions, all given by Detective Sergeant Kowalski of the Michigan State Police, as to what discussion there was regarding an attorney during this time. A portion of the preliminary examination transcript, which was also read at the *Walker* hearing, discloses the following:

> *Q. [Defense Counsel]* Was the word attorney or lawyer mentioned at all?
> *A. [Sgt. Kowalski]* Yes sir, it was.
> *Q.* Apart from yourself?
> *A.* Yes sir.
> *Q.* Alright and would you tell the court what was said with regard to an attorney or lawyer?
> *A.* Yes sir, it got to the point where we were talking and Mr. Myers said—he yelled out alright I killed her. I stabbed her. And I said is that really

---

[5] *People v Brannan*, 406 Mich 104; 276 NW2d 14 (1979).

the truth? He said no, but that's what you want to
hear. I said all I want to hear is the truth. He said
maybe I should have an attorney. I said well, do
you want an attorney? One is available for you
and he sat and hesitated for a short time and he
said let's go on. That's the only time the mention
of an attorney was made.

Sgt. Kowalski also gave the following testimony
at the *Walker* hearing:

> *Q.* . . . When Mr. Myers said to you that
> maybe he should have an attorney, why didn't
> you, at that point, completely cease discussing this
> matter with him?
> *A.* Because I felt that Mr. Myers at that time
> still had the option of whether he wanted an
> attorney present or not. So, after he's made the
> statement, "Maybe I should have an attorney," I
> asked him at that time, "Do you want one? If you
> want one, there's a telephone. We'll make the call
> right now, and you can have one. It's still your
> option."
> *Q.* Who were you intending to call?
> *A.* Who was I intending—attempting to make—
> *Q.* No. When you said that, "Here's a phone,
> we'll have one for you," who were you going to
> call?
> *A.* I was going to let Mr. Myers call any attor-
> ney he'd like, or call anybody he'd like.
> *Q.* Did you discuss with him or suggest to him
> whether he should have an attorney?
> *A.* Absolutely.

Defendant's *Miranda* rights had been explained
to him prior to this part of the conversation and
were again explained to him at the beginning of
the tape-recorded confession. Both the defense and
the prosecution refer to the following language in
*Miranda* as the prime statement of defendant's
rights in this regard:

Once warnings have been given, the subsequent procedure is clear. *If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.* At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. *If the individual states that he wants an attorney, the interrogation must cease until an attorney is present.* At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. *If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent.*[6]

Following *Miranda*, the United States Supreme Court held as follows in *Edwards v Arizona:* [7]

[W]e now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities *until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.*

Although declining to make it retroactive, the United States Supreme Court reaffirmed the *Ed-*

6 *Miranda, supra,* pp 473-474.

7 451 US 477, 484-485; 101 S Ct 1880; 68 L Ed 2d 378 (1981).

*wards* rule in *Solem v Stumes*,[8] calling it "a bright-line rule to safeguard pre-existing rights" and, recently, in *Michigan v Jackson*,[9] extending its application to the Sixth Amendment right to counsel. Our own Supreme Court applied the *Edwards* rule in *People v Paintman*.[10]

Under the rule enunciated in *Edwards* and *Paintman*, we must ask three questions in reviewing defendant's claim: (1) did defendant communicate a request for counsel; (2) if so, did the interrogation by police stop at that point; and (3) if it did, did defendant afterwards, but before questioning resumed, waive his right to counsel. In answering all of these questions, we recall that the trial court's decision constituted at least a presumptive answer to each, which we must affirm unless we are left with a firm and definite conviction that a mistake has been made.[11]

This Court has consistently held that an ambiguous indication of interest in having counsel requires cessation of police interrogation. Examples of such ambiguous indications of interest include asking a police officer whether he thinks the defendant should have an attorney,[12] asking the police whether it was possible to get an attorney at an unusually early hour of the morning,[13] stating that the defendant was willing to talk to police but did not wish to write anything down unless an attorney was present,[14] and saying that the defendant might wish to contact his uncle, who appar-

---

[8] 465 US 638, 646; 104 S Ct 1338; 79 L Ed 2d 579 (1984).

[9] 475 US —; 106 S Ct 1404; 89 L Ed 2d 631 (1986), aff'g *People v Bladel (After Remand)*, 421 Mich 39; 365 NW2d 56 (1984).

[10] 412 Mich 518, 525-526; 315 NW2d 418 (1982), cert den 456 US 995; 102 S Ct 2280; 73 L Ed 2d 1292 (1982).

[11] *People v Shelson*, 150 Mich App 718, 724; 389 NW2d 159 (1986).

[12] *People ex rel Wayne Prosecutor v Recorder's Court Judge*, 79 Mich App 495; 261 NW2d 63 (1977).

[13] *People v Lewis*, 47 Mich App 450; 209 NW2d 450 (1973).

[14] *People v Plyler*, 86 Mich App 272; 272 NW2d 623 (1978).

ently was a lawyer.[15] In this case, the officer testified that defendant said, "Maybe I should have an attorney." This statement, if ambiguous, was sufficient to trigger the requirements of *Edwards* and *Paintman*.

We also believe that the interrogation stopped, albeit briefly, after defendant made his request. Sgt. Kowalski testified that he replied to defendant either by saying that an attorney was available, or by giving defendant the phone or offering to make a call for an attorney. Defendant seems to find significant the fact that Sgt. Kowalski did not have any particular attorney in mind when he offered to make the call. This is not significant, however, in the context of deciding whether the interrogation stopped upon defendant's request for counsel. To offer to get counsel for defendant or ask defendant whether he wanted counsel was an entirely different action than continuing to question him.

Obviously, the interrogation eventually resumed. The key question, therefore, is whether defendant waived his rights before the next question was asked of him. We can narrow the issue even further: Did defendant, by saying "No, let's go on," reinitiate the discussion with the police and thereby waive his rights to counsel? In *People v Lewis,*[16] the defendant asked whether it was possible to obtain counsel at an unusual hour, was told that it was not possible, and then said "forget it." Questioning began thereafter. We held that the defendant's words did not constitute a voluntary, knowing and intelligent waiver of his rights.

On the other hand, in *People v Smith,*[17] the defendant asked for an attorney and was told that one could not be obtained at that time, but also

---

[15] *People v O'Donnell,* 127 Mich App 749; 339 NW2d 540 (1983).

[16] See n 13, *supra.*

[17] 59 Mich App 25, 30-32; 228 NW2d 826 (1975).

that an attorney would eventually be appointed. The defendant then decided to make a statement without an attorney, which we held was a valid waiver of rights. In *People v McCuaig*,[18] a police officer responded to the defendant's request for counsel by saying that he would comply with that request and that no further questioning would take place. The police officer then advised the defendant concerning the nature of the charge and described the circumstances which led the police to believe that defendant was the culprit. Defendant responded by saying that the officer had been fair with him and that he had changed his mind and wished to give a statement. We held that the police officer's statements could not be characterized as further interrogation or its functional equivalent, so that defendant's statement that he had changed his mind constituted a knowing, voluntary and intelligent waiver of the previously invoked right.[19] Similarly, in *People v O'Donnell*,[20] the police officer responded to the defendant's request for counsel by providing defendant with a telephone with which to call an attorney. The defendant declined to use the phone and, thereafter, without prompting, confessed to the crime. We held that the defendant's *Miranda* rights were not violated.

Perhaps there is a pattern in these cases in which the defendants spoke to police after requesting counsel and before being asked any more questions concerning the crime. Where the response to the defendant's request was that counsel would be obtained or was available, or else the response was to give the defendant the means to

[18] 126 Mich App 754; 338 NW2d 4 (1983).

[19] *Id.*, p 760, citing *Rhode Island v Innis*, 446 US 291, 300-301; 100 S Ct 1682; 64 L Ed 2d 297 (1980).

[20] See n 15, *supra*.

contact an attorney, further volunteered information is held to be a waiver of rights. On the other hand, where, as in *Lewis, supra,* the police respond that counsel is *not* available, without making any indication that counsel will be available in the immediate future, any additional statements by defendant do *not* constitute a waiver. This is a sensible distinction. The police officer, by indicating that counsel is available or giving a suspect the means to contact counsel, shows the suspect that his constitutional rights are not illusory, that the officer is bound by them and will act accordingly. A simple reply that counsel is unavailable, however, in a custodial context, may emphasize the officer's power over the suspect, rather than the constitution's power over both. A defendant cannot knowingly and intelligently waive his rights unless he is certain that those rights will be respected.

Here, the officers ceased their interrogation, offered a means to defendant to contact counsel and asked no more questions until defendant said "No, let's go on." By making it clear to defendant that counsel would be provided upon his request, they made sure that any waiver of rights would be voluntary, knowing and intelligent. We should add, however, that this is a close case. Had the officers *not* offered the phone to defendant, or had defendant *not* said "No, let's go on," but rather had waited for the police to ask another question, we would likely hold that the waiver was not valid.

Defendant's third argument on appeal is that he was denied his right to a fair trial because the prosecutor failed to promptly disclose to defense counsel oral admissions of defendant which the prosecutor intended to use as evidence against defendant. There were three admissions to which

defendant objects and which formed the basis for four separate motions for mistrial below.

The first admission consists of statements made to Kim Gregg, defendant's accomplice, while they were incarcerated together. Gregg testified that he had said to defendant, "Seventeen times?" to which defendant replied, "No, I didn't think I stabbed her that many times." Gregg further testified that defendant stated that he wanted to get a black man called "Shiney" involved with the case. Defense counsel said that he learned of these statements of defendant only when Gregg testified to them. A pretrial statement completed and filed by the prosecutor indicated that the only verbal confessions or admissions by defendant which the prosecution planned to offer at trial were those given to the detectives. The prosecution had later endorsed Kim Gregg as a witness, but had not indicated that any inculpatory admissions of defendant would be part of Gregg's testimony.

At the pretrial hearing, defense counsel had referred to the prosecutor's pretrial statement in the context of noting that he had not received any laboratory reports and asking for the court's assistance in seeing that he promptly receive those reports. The prosecutor responded by assuring defense counsel that he did not need the assistance of the court to obtain the reports. The trial judge denied defense counsel's request for an order concerning the laboratory reports, saying that such an order was not necessary at that time and that he did not like "placing orders that infer that someone is not going to be as cooperative as they normally have been."

The prosecutor informed defense counsel, at the time of the objections concerning the Gregg testimony, that he would probably be offering admissions in the testimony of Misty DuBois and Rol-

land Harlow. Defense counsel objected to this testimony when it was offered six days later. Harlow testified that "there was a possibility" that defendant had told him that he had "stabbed her twice," or that defendant had said that to Harlow's ex-wife. This statement was objected to, and the jury was instructed to disregard it. Defense counsel objected, again complaining that the prosecutor had not informed him of this inculpatory statement before trial, and that the corrective instruction given by the judge was insufficient to remove the prejudicial effect of the statement.

DuBois testified that defendant had called her from jail within a week or two of his arrest. During the conversation, defendant said "that he only did it two or three times and that there was no way that he did it seventeen times." Defendant moved for a mistrial, which was denied.

Defendant's argument on this issue is that the prosecutor's failure to promptly disclose evidence of admissions by defendant was the equivalent of violating a discovery order. Defendant analogizes the prosecutor's pretrial statement to a discovery order for this purpose, because the statement limited its list of oral admissions to those given to the police officers, because it contained a provision whereby the prosecutor would amend the statement if additional information was obtained and because of the prosecutor's assurances of cooperation at the pretrial conference where the judge was persuaded not to issue a discovery order. There seems to be some support for such an analogy, particularly where a prosecutor represents to the trial court that he will furnish defendant with the broad category of documents later withheld, thus avoiding a discovery order. The Court in

*People v Pace*,[21] which is the principal case supporting the suppression of evidence withheld in violation of a discovery order, specifically raised this analogy.

The difficult question defendant raises on appeal is whether we should extend this analogy to cases where the prosecutor gave no assurance about the general category of evidence which was eventually withheld, but instead discussed an entirely different, specific form of evidence. That is, while a "tip sheet," as discussed by the *Pace* Court, conceivably comes under the broad category of "police report," it is difficult to see how an oral admission could come under the category of "laboratory report." Defendant argues that had the prosecutor not made his assurances to defense counsel regarding his admissions, he might have sought and obtained a broad discovery order which might have included the admissions in question.

However, even if we were to find the equivalent of a violation of a discovery order, we need not pursue it further because clearly any such violation was harmless beyond a reasonable doubt.[22] Not only did defendant have six days in which to prepare for the testimony of the witnesses DuBois and Harlow, but the record reveals that defense counsel met with Gregg on two occasions prior to the start of trial and used these conversations effectively in cross-examination. This is significant because the only prejudice defendant claims on appeal is that he had inadequate opportunity to investigate the admissions in order to prepare his cross-examination. There is no showing or indication that any fact exists relative to these witnesses' credibility which could have been brought out if the prosecutor had fully complied with the

---

[21] 102 Mich App 522, 530; 302 NW2d 216 (1980).

[22] *Id.*, pp 530-531.

discovery to which defendant refers and which would have had any impact on the defense presented.[23]

Further, there was considerable additional evidence implicating defendant, including but not limited to defendant's own confession to the police and Gregg's testimony concerning the actual events at the scene of the crime. We do not believe that the jury would have reached a different conclusion if the objected-to testimony had been eliminated altogether.[24] For these reasons, we hold that any "failure to comply with a discovery order" was harmless beyond a reasonable doubt, so that we will not reverse on this ground even if such a failure occurred.

Defendant's final argument on appeal is that the admission of a blood-soaked shirt and blanket was "not material to any point in issue" and had the effect of inflaming the passions of the jury. Defendant says that the only question of which the items could be probative would be the number of times the victim had been stabbed, which was not in dispute. The prosecutor replies that the evidence was offered not to show how many times the victim had been stabbed, but rather to rebut an inference that Gregg, rather than defendant, stabbed the victim because of bloodstains allegedly found on Gregg's clothing. The shirt and blanket, according to the prosecutor, would demonstrate that the blood was absorbed by those items, so that the killer would be less likely to have gotten any blood on himself. Defendant counters that such an inference as the prosecutor suggests is not logical, because blood could have spattered on the killer

[23] See *People v Hatch,* 126 Mich App 399, 402-403; 337 NW2d 79 (1983).

[24] See *People v McConnell,* 124 Mich App 672, 681; 335 NW2d 226 (1983).

regardless of whether it was soaked into the shirt and blanket. Indeed, defendant continues, the sheer quantity of blood in the shirt and blanket could indicate that blood *would* have spattered on the killer.

MRE 403 reads as follows:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

The trial court's exercise of its discretion in this regard will not be overturned unless there is a clear abuse of that discretion. Further, it is not within the province of this Court to second guess the trial court's decision.[25] Here, the trial court made a specific finding that the evidence was relevant and that the prejudicial effect did not outweigh the relevancy. We do not believe that the trial court abused its discretion in so ruling. Murder is often a bloody business, and it is only in extreme situations that facts should be kept from the jury. There was no abuse of discretion here.

Affirmed.

---

[25] *People v Miller,* 141 Mich App 637, 639-640; 367 NW2d 892 (1985).